IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| DONALD KEITH NEWBURY | § | |
| | § | |
| Petitioner, | § | |
| | § | |
| VS. | § | |
| | § | NO. 3-06-CV-1410-K |
| RICK THALER, Director | § | |
| Texas Department of Criminal Justice, | § | |
| Correctional Institutions Division | § | |
| | § | |
| Respondent. | § | |

**MEMORANDUM OPINION AND ORDER
DENYING PETITION FOR WRIT OF HABEAS CORPUS**

Petitioner Donald Keith Newbury, sentenced to death for capital murder, petitions

the Court for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, contending that his

conviction and sentence are unconstitutional in several respects. The Court denies

petitioner's petition for a writ of habeas corpus.

## I. HISTORY OF THE CASE

A jury convicted petitioner of capital murder, and his punishment was assessed

at death by lethal injection. *State v. Newbury*, No. F01-00324-JT (283rd Judicial District

Court, Dallas County, Texas, Jan. 28, 2002). The Texas Court of Criminal Appeals

affirmed both the conviction and the death sentence. *Newbury v. State*, 135 S.W.3d 22

(Tex. Crim. App. Apr. 21, 2004). Petitioner filed a state application for writ of habeas

corpus on December 15, 2003. The Court of Criminal Appeals adopted the trial judge's findings and conclusions and denied relief with written order. *Ex parte Newbury*, 2006 WL 1545492 (Tex. Crim. App. Jun. 7, 2006).

Petitioner filed the instant federal writ of habeas corpus on June 4, 2007, challenging his conviction and death sentence. Contemporaneous with the filing of his petition, petitioner filed a motion to stay and abate the petition, which the Court denied on November 20, 2007. (*See* Order, 11/20/07 [Doc. #22]). Respondent filed an answer on January 17, 2008, and furnished the state court records. Petitioner filed a reply brief on February 19, 2008.

## II. ISSUES

Petitioner raises following four grounds for relief :

A. Petitioner was denied his right to effective assistance of counsel under the Sixth Amendment and his due process rights under the Fourteenth Amendment because the trial court failed to strike two veniremembers who had been exposed to pretrial publicity for cause (grounds three and four);

B. Petitioner was denied his rights to due process and an impartial jury and was subjected to cruel and unusual punishment in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments because the Texas death penalty scheme does not require the State to prove the absence of mitigating circumstances beyond a reasonable doubt (ground two);

C. Petitioner was denied his due process rights and was subjected to cruel and unusual punishment in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments because the Texas death penalty scheme

permits the future dangerousness issue to be presented to the jury through vague, undefined terms used in the special jury instructions (ground five); and

D.  Petitioner was denied his Sixth Amendment right to effective assistance of counsel during the punishment phase of trial because counsel failed to conduct an adequate investigation into petitioner's background for mitigating evidence (ground one).

## III.  STANDARD OF REVIEW

Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. 104-132, 110 Stat. 1217, on April 24, 1996.  Title I of the Act applies to all federal petitions for habeas corpus filed on or after its effective date.  *Lindh v. Murphy*, 521 U.S. 320, 326 (1997).  Because petitioner filed the instant petition after its effective date, the Act applies to his petition.

Under 28 U.S.C. § 2254(d), as amended by the AEDPA, a state prisoner may not obtain relief:

with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). The denial of petitioner's state writ, as occurred in petitioner's case, constitutes an adjudication on the merits. *See Ex parte Thomas*, 953 S.W.2d 286, 288-89 (Tex. Crim. App. 1997). Therefore, for purposes of this court's review, the deferential treatment described in § 2254(d) is owed to the ultimate decision of the Texas Court of Criminal Appeals ("TCCA"). *Delgadillo v. Woodford*, 527 F.3d 919, 925 (9th Cir. 2008) ("The relevant state court determination for purposes of AEDPA review is the last reasoned state court decision.") (citing *Ylst v. Nunnemaker*, 501 U.S. 797, 804-806 (1991)); *Smith v. Quarterman*, 2008 WL 2353558 at *7 (N.D. Tex. Jun. 4, 2008), *COA denied*, No. 08-10668 (5th Cir. May 5, 2009) ("The state habeas court's decision is the last clear action of the state courts because the Texas Court of Criminal Appeals adopted the state habeas trial court's findings and conclusions...and denied the application for writ of habeas corpus without written order.").

Section 2254(d)(1) concerns pure questions of law and mixed questions of law and fact. *Moore v. Johnson*, 225 F.3d 495, 501 (5th Cir. 2000). A decision is contrary to clearly established Federal law, within the meaning of § 2254(d)(1), "if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000). With respect to the "unreasonable application" standard, *Williams* instructs that a writ must

issue "if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413; *accord Penry v. Johnson*, 532 U.S. 782, 792 (2001). A state court unreasonably applies Supreme Court precedent if it "unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Williams*, 529 U.S. at 407. "[A] federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable." *Id.* at 409; *accord Penry*, 532 U.S. at 793.

Section 2254(d)(2) concerns questions of fact. *Moore*, 225 F.3d at 501. Under § 2254(d)(2), federal courts "give deference to the state court's findings unless they were 'based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.'" *Chambers v. Johnson*, 218 F.3d 360, 363 (5th Cir. 2000) (quoting 28 U.S.C. § 2254(d)(2)). The resolution of factual issues by the state court is presumptively correct and will not be disturbed unless the state prisoner rebuts the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

## IV. FACTUAL BACKGROUND

The TCCA recited the following brief factual background in its opinion on direct appeal:

The evidence shows that appellant and others (the 'Texas 7')
escaped from prison. They later murdered a [Irving] police
officer in a volley of gunfire during a robbery on Christmas
Eve.

*Newbury*, 135 S.W.3d at 26. On December 24, 2000, the murder victim, Aubrey Hawkins,

was working as a peace officer for the City of Irving Police Department when he responded

to a call from dispatch indicating that suspicious persons had been reported at an Oshman's

Super Center ("Oshman's"). (R. 47:35, 110, 115, 117, 129). Shortly after hearing Hawkins

indicate over the radio that he had arrived at Oshman's, a responding officer found

Hawkins's lifeless body lying face-down in the store's loading dock. (R. 47:117, 120-23,

133-35). Autopsy results confirmed that Hawkins had been shot eleven times in the upper

part of his body and suffered injuries consistent with having been run over or dragged

by a car. (R. 49:99-112, 114-15). The medical examiner determined that Hawkins died

of multiple gunshot wounds and ruled his death a homicide. (R. 49:117).

In a sworn statement to the police, which was read to the jury during the guilt-

innocence phase of trial, petitioner described his involvement in the robbery that resulted

in Hawkins's death and commented on the incident:

Our first night out of prison we went to San Antonio and
stayed in a hotel. The very next morning we got up and went
to Houston. We got a hotel in Houston and stayed there a
few days. I believe that we came to the Dallas area to do a
robbery at Oshman's. I was against this plan because I didn't
feel we were ready to do a job that big. They didn't listen to

me. We ended up in a hotel in Carrollton off Interstate 35, got one room and it was Harper that got it.

Over the next few days we spent time casing stores and making plans to do the robbery. I was with the guys when they went to the store in Arlington and bought the smoke grenade and the security stuff. We actually cased the store for three days before the robbery. We watched the store two nights before the robbery. That night we watched them close and saw a police officer drive through the parking lot which we made note of.

The next day we did a driveby of the store. The night of the robbery we left the hotel around 5:00 p.m. in the Honda and the Suburban. We drove to Irving. I was riding in the Suburban. We drove the Honda to an apartment complex behind the Oshman's. We had already selected this location because if we needed to get away on foot, we could run across the field and get into the car. After parking the Honda we then drove back to the parking lot where the Oshman's is located.

Once there we went into the store at different times. My assignment was to go to the gun department and keep the manager and employees occupied. While I was doing this Rivas and Larry came in posing as security. They had taken some pictures out of the newspaper and made photocopies of them and used them as lineups. They were wearing ADT T-shirts that we got from the Salvation Army.

So they started showing the lineups and Rivas started talking to employees and getting them to come up to the front of the store. As he was I pushed the shopping cart that I had put radios and other merchandise in up to the front of the store so that the manager in the gun department would go up front.

Once everyone was up front, Rivas pulled his gun and announced the robbery. I had a .357 Mag. and as the gun manager went for his radio, I poked him in the back with the

gun. I told him not to. There was another employee who I thought was reaching for a panic button that I had to stop. I then checked the rest of the store to make sure no one was left. I found Manny in the back with an employee. I cuffed her up and had him take her up to the front. I then make another sweep and as I was going back to the front, they were bringing the employees to the back.

Once in the back I began searching the employees, taking money, jewelry, and weapons from them. I also was tying them up. Garcia was in the room with me, keeping everyone covered. I kept doing this until Garcia told me we had to roll. I grabbed at the bag that I had put all the property in and headed to the back door.

Rivas had pulled the Explorer around back. We all made it to the back door and we are getting ready to go out when Harper sent someone else after something. We waited until we could see him coming back before we all left out.

I was about the third or fourth guy out. When I got to the Explorer, there was already some stuff on the ground. I started loading the bags into the back of the Explorer. I was on the passenger side of the Explorer. I was putting the bags in the cargo over the back seat because we couldn't get the hatch open.

The cop pulls in and rams the Explorer with his car. I then hear gunplay go off. I jumped into the front passenger seat of the vehicle and Junior jumped in on top of me. The Explorer started back and I thought we had run over a bag, but later I heard it was the officer.

As we were pulling out I saw someone get out of the police car dressed in blue and come running toward the Explorer, carrying a gun. I thought it was the officer, so I fired three rounds at him. Junior was jumping around and messed up my shots. I shot through the window of the Explorer on the front seat

of the passenger side. I didn't hit the guy and saw it was Garcia. I later learned that Rodriguez had pulled the officer out of the car, took his gun, and Garcia got into the car and backed it up.

We drove to the complex where the Honda was. We unloaded the Explorer and waited until Angel showed up. I got into the back seat of the Honda and we left and headed back to the hotel. I reloaded everyone's gun in the Honda.

Once back at the hotel we unloaded everything and then me and another guy went to get medical supplies. We made two stops and got our stuff at a 24-hour Walgreen on Josey around Beltline. We then went back to the room and I doctored everyone up.

We were up all night and the next morning we loaded up and headed out. We counted our money and come up with about $73,000. We had another $20,000 or so in checks. We tore all those up and threw them away. We kept what we needed of the employees property and got rid of the rest.

We drove and finally ended up in Colorado. We each got a grand a piece off the back. It wasn't until later that I was able to persuade them to divide the rest of the money. We then got $5,510 each.

I believe that if the street cops would have been trained better, this situation never would have occurred. The officer should not have approached seven armed individuals without waiting on backup. It was obvious that we were all armed. It is tragic that it happened, but a longer training with rookies, it could have been prevented.

My heart goes out to the little boy who lost his dad on Christmas Eve and to his wife and his mother. They are the one that got the loss.

(R. 51:140-44; *see also* St. Exh. 750).

On January 21, 2001, law enforcement surrounded five members of the "Texas 7" in two locations in Woodland Park, Colorado. (R. 50:34-35). One of the men committed suicide, and the other four surrendered. (R. 50:53, 76; R. 51:131). Two days later, petitioner and the remaining member of the group were discovered in a Holiday Inn in Colorado Springs, Colorado. (R. 51:37-51). After several hours of negotiations, the two men surrendered. (R. 51:77-80, 84). Ten loaded handguns and two loaded shotguns, along with nearly $5,000 in cash, were recovered from the men's hotel room. (R. 51:108-119).

## V.  EXAMINATION OF THE GROUNDS FOR RELIEF

## A.    Challenge for Cause Claims

In his third and fourth grounds for relief, petitioner contends that the trial court violated his right to effective assistance of counsel under the Sixth Amendment and his due process rights under the Fourteenth Amendment when Judge Webb Biard, who presided over voir dire, failed to strike two veniremembers, Shirley Taylor and Rex Francis, for cause. According to petitioner, both Taylor and Francis were subject to removal from the jury panel because they had been exposed to pretrial publicity and had already formed opinions regarding his guilt. Because they were not removed for cause and defense counsel did not use a peremptory strike to remove them from the panel, both Taylor and Francis

ultimately sat on the jury. As a result, petitioner asserts that he was denied the right to an impartial jury.

As an initial matter, the Court notes its agreement with respondent that, although petitioner states that the trial court's error denied him effective assistance of counsel, he sets forth no argument or caselaw to support this contention. (*See* Fed. Pet. at 9, 11 and attached pp. 13-14). Similarly, in his state habeas application, petitioner conclusorily alleged that he was denied effective assistance of counsel due to the trial court's handling of his challenges for cause, but failed to expand upon this claim in any way. (*See* St. Hab. Tr. at 47, 63, 65-66). As a result, the state habeas court did not address the claim. After respondent raised petitioner's failure to brief the ineffective-assistance-of-counsel claim in his response, petitioner did not argue otherwise; instead, petitioner recharacterized the claim presented in grounds three and four as a claim that "he was denied an impartial jury in violation of the Sixth and Fourteenth Amendments to the United States Constitution." (Pet. Reply at 6). The Court concludes that any Sixth Amendment ineffective-assistance-of-counsel claim related to the trial court's failure to remove Taylor and Francis for cause is waived for failure to adequately brief. *See Trevino v. Johnson*, 168 F.3d 173, 181 n.3 (5th Cir. 1999) (citing cases).

Turning to petitioner's claims that his due process rights were violated as a result of the court's failure to remove Taylor and Francis for cause, respondent counters with

two arguments.  First, respondent contends that petitioner did not properly preserve these constitutional claims because he failed to exercise peremptory challenges to remove the jurors in question.  Second, respondent asserts that petitioner's claim lacks merit because Taylor and Francis were not subject to dismissal for cause.  As discussed below, the Court disagrees with respondent's contention that petitioner has not properly preserved his juror-bias claims.  However, petitioner is not entitled to relief in any event because his claims lack merit.

*Procedural History of Juror-Bias Claims*

During jury voir dire, defense counsel challenged Veniremembers Shirley Taylor and Rex Francis for cause on several grounds including, *inter alia*, that they were not impartial jurors due to their exposure to pretrial publicity.  (R. 20:253-55 (Taylor); R. 28:186-88 (Francis)).  The trial court denied both challenges.  (R. 20:255 (Taylor); R. 28:189 (Francis)).  Noting that he had already used over half of his peremptory challenges and only three jurors had been seated by the time Taylor came under consideration, counsel declined to exercise a peremptory challenge to strike Taylor from the jury.  (R. 20: 257).  Similarly, defense counsel opted not to use a peremptory strike to remove Francis from the jury panel because he only had three remaining strikes and only six jurors had been seated when Francis came before the court.  (R. 28:190).  During direct appeal, the appellate court determined that petitioner failed to show that he was harmed by the court's

decision not to strike Taylor and Francis for cause because he could have used peremptory challenges to remove both jurors. *Newbury*, 135 S.W.3d at 32. At the state habeas level, petitioner again argued that the trial court violated his rights under the Sixth and Fourteenth Amendments when it failed to strike Taylor and Francis for cause despite their exposure to pretrial publicity. (St. Hab. Tr. at 47-48, 63, 65-66). The Court of Criminal Appeals denied relief. *Ex parte Newbury*, 2006 WL 1545492 at *1.

*Preservation of Juror-Bias Claims*

Respondent initially argues that petitioner's failure to exercise peremptory strikes to remove Taylor and Francis from the jury precludes this court from granting habeas relief. The Supreme Court has recognized that a trial court's failure to remove a constitutionally unfit juror for cause is constitutional error requiring reversal of a death sentence only if two additional conditions are satisfied: (1) the juror sat on the jury that ultimately sentenced the petitioner to death, and (2) the petitioner properly preserved his right to challenge the trial court's failure to remove the juror for cause. *See Morgan v. Illinois*, 504 U.S. 719, 728-29 (1992). Respondent asserts that, even assuming Taylor and Francis were constitutionally objectionable jurors, petitioner is not entitled to habeas relief because he did not properly preserve his right to challenge the trial court's error. As support for this proposition, respondent cites *Ross v. Oklahoma*, 487 U.S. 81 (1988), in which the United States Supreme Court addressed a petitioner's due-process claim that

he was arbitrarily deprived of his full number of peremptory challenges because he was forced to use a peremptory challenge to correct the trial court's error in denying a challenge for cause. *Id.* at 89. The Supreme Court ultimately held that petitioner was not unconstitutionally deprived of a peremptory challenge because the objectionable juror did not sit on the jury and because he received all of the protection provided by state law. *Id.* at 90-91. In its discussion of the petitioner's due-process claim, the Supreme Court highlighted the "long settled" principle developed by Oklahoma courts requiring a petitioner to exercise a peremptory challenge in order to preserve his claim that the trial court's ruling on a for-cause challenge deprived him of a fair trial. *Id.* at 89.

While Oklahoma law requires the use of a peremptory challenge to preserve error where a trial court fails to excuse an objectionable juror for cause, it is far from clear that this requirement exists in Texas law. During petitioner's direct appeal, the TCCA recognized that there had been past confusion on this point, but indicated that petitioner's failure to cure the trial court's denials of his for-cause challenges through the use of peremptory strikes did not affect whether his claims were preserved, but was instead relevant to the appellate court's harm analysis. *See Newbury*, 135 S.W.3d at 32 (citing *Johnson v. State*, 43 S.W.3d 1, 5 n.6 (Tex. Crim. App. 2001)). Ultimately, the TCCA denied relief with respect to petitioner's claims regarding Veniremembers Taylor and Francis on the merits during petitioner's direct appeal when it concluded that petitioner did not suffer

any harm from the trial court's alleged error. *See Newbury*, 135 S.W.3d at 32. Given the fact that the highest court in Texas apparently determined that the instant juror-bias claims were properly preserved for appellate review, this court will not conclude that habeas relief is unavailable to petitioner because he failed to properly preserve the claims. Nevertheless, because, as discussed below, petitioner has failed to show that either Taylor or Francis was a constitutionally objectionable juror, he is not entitled to federal habeas relief.

*Applicable Law*

"It is well settled that the Sixth and Fourteenth Amendments guarantee a defendant on trial for his life the right to an impartial jury." *Ross*, 487 U.S. at 85. However,"[a] person is not automatically rendered unqualified to serve as a juror merely because he has been exposed to media coverage of the charged crime." *Bell v. Lynaugh*, 828 F.2d 1085, 1093 (5th Cir. 1987); *see also Mu'Min v. Virginia*, 500 U.S. 415, 430 (1991), *quoting Irvin v. Dowd*, 366 U.S. 717, 722 (1961) ("It is not required...that the jurors be totally ignorant of the facts and issues involved."). Even if the juror has formed a preconceived notion regarding the defendant's guilt or innocence, he remains constitutionally fit to serve on the jury if he "can lay aside his impression or opinion and render a verdict based on the evidence presented in court." *Irvin*, 366 U.S. at 722-23. The relevant question to be considered is "did [the] juror swear that he could set aside any opinion he might hold and decide the case on the evidence, and should the juror's protestation of impartiality

have been believed." *Patton*, 467 U.S. 1025, 1036 (1984); *see also Bell*, 828 F.2d at 1093 ("The issue becomes whether exposure to media publicity will preclude the individual from returning a verdict based solely on the person's application of the law as stated to the evidence presented").

The question of whether a juror can set aside his opinion and base his verdict on the evidence presented in court is a question of historical fact entitled to "special deference." *Patton*, 467 U.S. at 1036-38 & n.12; *White v. Quarterman*, 275 Fed.Appx. 380, 381 (5th Cir. Apr. 25, 2008), *cert. denied*, 129 S.Ct. 494 (2008) ("Juror bias *vel non* is a finding of fact.") (citing cases); *see also Varga v. Quarterman*, 321 Fed.Appx. 390, 395 (5th Cir. Apr. 13, 2009), *cert. denied*, 130 S.Ct. 797 (2009) ("Deference is paid to a trial judge's determination of bias precisely because the trial judge is there to see and hear the juror and is in the best position to make credibility determinations."). Therefore, in order to succeed on his juror-bias claims, petitioner must show "'the adjudication of the claim [on the merits in State court proceeding]...resulted in a decision that was based on an *unreasonable* determination of the facts in light of the evidence presented in the State court proceeding." *White*, 275 Fed.Appx. at 381 (emphasis in original) (citing 28 U.S.C. § 2254(d)(2)); *see also Moore*, 225 F.3d at 504 (applying § 2254(d)(2) standard to habeas petitioner's claim of juror partiality). The TCCA's determination of the claim "shall be presumed to be correct," and the petitioner "shall have the burden of rebutting the

presumption of correctness by *clear and convincing evidence*." *White*, 275 Fed.Appx. at 381 (emphasis in original) (quoting 28 U.S.C. § 2254(e)(1)).

*Analysis Regarding Shirley Taylor*

In its findings and conclusions, the state habeas court adopted the appellate court's conclusion that, because a peremptory challenge was not "wrongfully taken" from petitioner, he could not show that he was harmed by the trial court's denial of his challenge for cause as to Taylor. (St. Hab. Tr. at 410-11, ¶¶ 165-66). The court further found that petitioner failed to show that Taylor was subject to a challenge for cause because "Taylor stated she had no opinions one way or the other and could set aside what she heard in the media and wait until she heard the evidence in the case before deciding whether [petitioner] was guilty or not." (*Id.* at 411, ¶¶ 167-68 (citing R. 20:179-81)). Therefore, the court determined that the trial court "could have reasonably concluded that Taylor had not established in her mind a conclusion of guilt that would influence her verdict." (*Id.* at 411, ¶ 169).

The state court's conclusion that Taylor was not subject to a challenge for cause is amply supported by the record. During the prosecutor's voir dire examination, Veniremember Taylor admitted that, as stated in her juror questionnaire, she was aware that seven men had escaped from prison, had killed Officer Hawkins while robbing an Oshman's, and were later captured in Colorado. (R. 20:178). She did not know whether

17

petitioner had participated in the crimes did not have an opinion as to what specifically happened. (R. 20:180). Later, during defense counsel's voir dire examination, Taylor acknowledged that she had seen Officer Hawkins's mother on the news and that she thought that George Rivas had been given the death penalty for his involvement in the crime. (R. 20:215-18). However, Taylor attested that she had not thought much about the case, could presume petitioner innocent, and could wait until she was on the jury and heard the evidence before deciding petitioner's guilt. (R. 20: 178-81). When asked if she believed the jury punished Rivas appropriately, Taylor again noted that she had not paid much attention to the case, opined that the punishment was appropriate if Rivas had actually fired the weapon that killed Officer Hawkins, and stated that she had no idea if Rivas had committed the crime because she had not heard the evidence in that case. (*See id.* at 219).

In rejecting petitioner's juror-bias claims during state collateral review, the TCCA determined that petitioner failed to show that Taylor was biased. Petitioner has not submitted any evidence, much less clear and convincing evidence, to rebut this factual finding. While Taylor was able to recite a few bare facts related to crimes committed by the "Texas 7," she affirmed that she had not formed an opinion regarding petitioner's guilt and could not even identify petitioner as a participant in any of the crimes. She further testified that she could wait to determine petitioner's guilt until after hearing the evidence

presented. That Taylor was aware of Rivas's punishment did not render her impartial, as, even with regard to that case, Taylor stated that she did not know whether Rivas was guilty because she had not heard the evidence against him. Although petitioner claims that Taylor testified that she "believed [the death penalty] to be the appropriate punishment" in Rivas's case, (*see* Fed. Pet. at 11), this statement mischaracterizes her testimony. Taylor stated that she believed that the death penalty was appropriate in Rivas' case "*if* he actually was the one who fired the weapon that killed the officer." (R. 20: 219 (emphasis added)). Not only is this statement devoid of any opinion regarding petitioner's guilt, it actually suggests that Taylor might have been a favorable witness to the defense, as the State acknowledged that it could not show that petitioner actually fired the weapon that killed Officer Hawkins. (R. 52:15). Accordingly, the Court cannot conclude that the state court's rejection of petitioner's juror-bias claim with respect to Taylor was in any way unreasonable.

*Analysis Regarding Rex Francis*

As with Veniremember Taylor, the state habeas court adopted the appellate court's conclusion that, because a peremptory challenge was not "wrongfully taken" from petitioner, petitioner could not show that he was harmed by the trial court's denial of his challenge for cause with regard to Veniremember Francis. (St. Hab. Tr. at 410-11, ¶¶ 165-66). The court further found that petitioner failed to show that Francis was subject to a

challenge for cause because "[Francis] testified he would not characterize what he has as an 'opinion' and would not say applicant is guilty right now. [Francis] also indicated that he strongly believed in the presumption of innocence at trial." (*Id.* at 411-12, ¶¶ 167, 170) (citing R. 28:164, 166)). Therefore, the court determined that the trial court "could reasonably conclude that [Francis] had no preformed opinions as to [petitioner's] guilt." (*Id.* at 412, ¶ 171).

The state court's conclusion that Francis was not subject to removal for cause is borne out by the record. Francis admitted that he had learned several facts of the case through the media: he remembered hearing that seven people had escaped from jail, that petitioner was one of the seven escapees, that they were thought to be responsible for the killing of a police officer at Oshman's, and that they were apprehended in Colorado. (R. 28:157-59, 161, 164). He further stated that, based on the information presented by the media, he believed that the seven escapees, including petitioner, had been involved in the incident at Oshman's and the death of the police officer. (R. 28:161, 164). He was also aware that Rivas had been tried and received the death penalty. (R. 28:162).

During Francis's voir dire examination, the prosecutor asked him whether he could set aside the reports that he had heard in the media and judge the case by what was presented in court, and Francis answered in the affirmative. (*See* R. 28:118). Francis also stated that he did not know whether he agreed with the verdict in Rivas's case because

he did not hear the facts presented in that case and did not believe it would be fair for him to render a judgment. (R. 28:162-63). Later, when pressed by defense counsel regarding his ability to set any preconceived notions aside, Francis responded as follows:

> It has always been to me that, you know, when you go into a trial, a person is innocent until proven guilty, even though I might feel like maybe he had-- you know, maybe he was involved in a situation. But still they--the evidence has to prove that this particular person committed the offense.

(R. 28:166).

To be sure, Francis was aware of many facts of the case and apparently believed that petitioner was a participant in the crime alleged. However, Francis unequivocally stated that he could lay aside his opinions and knowledge of the case and judge petitioner's guilt based solely on what was presented in court. These statements support the trial court's finding that Francis was an impartial, constitutionally sound juror. *See, e.g., Patton*, 467 U.S. at 1038-39 (concluding sufficient support in the record existed to support state courts' conclusion that juror would be impartial where juror ultimately testified that he could set aside opinions gleaned from pretrial publicity and "enter [the jury box] with a very open mind" despite early ambiguity in his testimony). Petitioner has presented no evidence that Francis was actually biased or that his claims that he could decide petitioner's guilt based on the evidence presented at trial were untruthful. Therefore, petitioner has failed to rebut the presumption of correctness accorded the trial court's ruling that Francis was impartial by clear and convincing evidence and, consequently,

this court cannot conclude that the state court's rejection of petitioner's juror-bias claim regarding Francis was unreasonable. With respect to both Taylor and Francis, this ground for relief is overruled.

**B.     Mitigation Special Issue Claim**

In his next ground for relief, petitioner contends that the mitigation special issue that the jury was required to answer at the punishment phase of his trial was unconstitutional because it did not place a burden of proof on the State. Specifically, petitioner contends that the State should have been required to establish beyond a reasonable doubt the absence of mitigating factors sufficient to warrant a life, rather than a death, sentence. (Fed. Pet. at 8 and attached p. 13).

*Review on the Merits*

Petitioner's claim fails on the merits. Pursuant to Article 37.071 of the Texas Code of Criminal Procedure, the jury was required to answer the following three special issues at the punishment phase of petitioner's trial:

> Do you find from the evidence beyond a reasonable doubt that there is a probability that the defendant, Donald Keith Newbury, would commit criminal acts of violence that would constitute a continuing threat to society?

> Do you find from the evidence beyond a reasonable doubt that the defendant, Donald Keith Newbury, actually caused the death of the deceased, Aubrey Hawkins, or did not actually cause the death of the deceased but intended to kill the deceased or another or anticipated that a human life would be taken?

Do you find, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, that there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed?

(St. App. Tr. at 257-59).  The jury answered the first two questions "yes" and the third question, the mitigation special issue, "no." (*Id.*).

Petitioner asserts that the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution require that the jury decide the mitigation special issue using the "beyond a reasonable doubt" standard.  He claims that, because the jury was not required to use the "beyond a reasonable doubt" standard to decide the mitigation special issue, he was denied due process, was denied an impartial jury, and was subjected to cruel and unusual punishment.  Although he does not cite specific cases in his federal habeas petition, petitioner cited the Supreme Court cases *Ring v. Arizona*, 536 U.S. 548 (2002), and *Apprendi v. New Jersey*, 530 U.S. 466 (2000), in support of this claim at the state-court level.  (*See* St. Hab. Tr. at 88-91).

In addressing this issue on direct appeal, the TCCA, citing a previous case from that court which held that the absence of a burden of proof in the mitigation special issue violated neither *Apprendi* nor *Ring*, overruled this point of error. *Newbury*, 135 S.W.3d at 45 (citing *Blue v. State*, 125 S.W.3d 491, 500-01 (Tex. Crim. App. 2003)).  On state habeas review, the TCCA adopted the state trial court's determination that this claim be denied because it had already been raised and rejected on direct appeal and, in the

alternative, because it lacked merit.  This is not an unreasonable application of federal law.

In *Apprendi*, the Supreme Court held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt."  530 U.S. at 490. In *Ring*, the Supreme Court extended *Apprendi* to death penalty cases, holding that where a state capital murder statute requires the finding of certain aggravating factors permitting an increase in a sentence from life imprisonment to death, these factors must be found by a jury beyond a reasonable doubt.  *See* 536 U.S. at 609.  Petitioner appears to be arguing that the mitigating special issue acts as an aggravating factor because the absence of mitigating factors aggravates his sentence from life to death, and therefore a jury must find the absence of such evidence beyond a reasonable doubt.  However, neither *Apprendi* nor *Ring* addresses mitigating factors.  *See Ring*, 536 U.S. at 597 n.4 ("[Ring] makes no Sixth Amendment claim with respect to mitigating circumstances").  Moreover, as the Fifth Circuit has observed, unlike the aggravating factors at issue in *Apprendi* and *Ring*, a "finding of mitigating circumstances *reduces* a sentence from death, rather than increasing it to death." *Granados v. Quarterman*, 455 F.3d 529, 537 (5th Cir.), *cert. denied*, 127 S.Ct. 732 (2006) (emphasis added).

Contrary to petitioner's argument, the Fifth Circuit has repeatedly held that there is no constitutional requirement that Texas's mitigation issue be assigned a burden of proof.

*See Ortiz v. Quarterman*, 504 F.3d 492, 505 (5th Cir. 2007), *cert. denied*, 128 S.Ct. 2428 (2008) ("The Texas death penalty scheme does not violate *Apprendi* or *Ring* by failing to require the State to prove beyond a reasonable doubt the absence of mitigating circumstances.") (citing *Scheanette v. Quarterman*, 482 F.3d 815, 828 (5th Cir. 2007); *Granados*, 455 F.3d at 536). This Court is not at liberty to overrule Fifth Circuit precedent. Moreover, based on this precedent, the state court decision is not an unreasonable application of federal law. Finally, as respondent correctly asserts, this claim is barred by the non-retroactivity doctrine of *Teague v. Lane*, 489 U.S. 288, 310 (1989), because, at the time petitioner's sentence and conviction became final for *Teague* purposes, no federal court had held that the Constitution mandated assignment of a burden of proof on either party in connection with the Texas capital sentencing scheme's mitigation special issue. *See Oliver v. Quarterman*, 254 Fed.Appx. 381, 386 (5th Cir. Nov. 16, 2007) (citing Fifth Circuit cases consistently upholding Texas's scheme of not instructing jury regarding burden of proof for mitigating factors); *Rowell v. Dretke*, 398 F.3d 370, 378 (5th Cir.), *cert. denied*, 126 S.Ct. 103 (2005) ("No Supreme Court or Circuit precedent constitutionally requires that Texas's mitigation special issue be assigned a burden of proof."). Accordingly, this ground for relief is denied.

C.      **Special Issues' Terms Claim**

As noted above, at the punishment phase of the trial, the jury was required to answer the following special issue regarding petitioner's future dangerousness:

Do you find from the evidence beyond a reasonable doubt that there is a probability that the defendant, Donald Keith Newbury, would commit criminal acts of violence that would constitute a continuing threat to society?

(St. App. Tr. at 257). In his fifth ground for relief, petitioner contends that he was denied the right to due process and subjected to cruel and unusual punishment in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution because the terms "probability," "criminal acts of violence," and "continuing threat to society" in this question were vague and undefined. (Fed. Pet. at attached pp. 14-15). Respondent contends that this claim is both *Teague*-barred and meritless.

Where death-penalty petitioners have asserted identical claims, the Fifth Circuit has consistently held that the terms identified by petitioner are not unconstitutionally vague and can instead be understood in their common meaning. *Leal v. Dretke*, 428 F.3d 543, 553 (5th Cir. 2005), *cert. denied*, 126 S.Ct. 1771 (2006) (citing cases rejecting argument that Texas capital sentencing scheme's special issues unconstitutionally vague because they fail to define "probability," "criminal acts of violence," and "continuing threat to society"). Furthermore, the Supreme Court has held that the future dangerousness special issue that the jury in the instant case was required to answer passes constitutional muster. *Jurek v. Texas*, 428 U.S. 262, 269-77 (1976). And, while the Supreme Court in *Penry v. Lynaugh*, 492 U.S. 302, 322-25 (1989), held that the future dangerousness special issue given to the jury in petitioner's case, standing alone, does not allow juries to consider adequately certain mitigating evidence such as mental retardation, the Supreme Court

has never determined that the federal constitution requires that terms used in that issue be given specific definitions.

The state habeas court concluded that the trial court's refusal to provide more specific definitions for the terms identified by petitioner did not violate the Constitution. (St. Hab. Tr. at 424). Given the long line of Fifth Circuit precedent supporting the state habeas court's denial of this claim for relief, it cannot be said that this decision was contrary to clearly established federal law. In addition, petitioner's argument is foreclosed by the non-retroactivity doctrine in *Teague* because, even if the claim were found to have merit, it would constitute a new constitutional rule of criminal procedure that would not apply retroactively to cases on collateral review. *See Leal*, 428 F.3d at 553 (upholding federal district court's determination that identical claim regarding same set of allegedly vague terms in Texas capital sentencing scheme's special issues *Teague*-barred). Accordingly, Petitioner's fifth ground for relief is without merit, and it is denied.

### D.  Ineffective Assistance of Counsel Claim

Finally, in his first ground for relief, petitioner claims that his defense counsel, Douglas A. Parks and Kevin M. Brooks, rendered ineffective assistance by failing to investigate and present certain mitigating evidence during the punishment phase of trial. (Fed. Pet. at 6 and attached pp. 1-13). Petitioner argues that, had this evidence been presented, the jury would have sentenced him to life imprisonment instead of death. Respondent argues that this claim is unexhausted and procedurally barred and,

alternatively, is without merit. As discussed below, the Court determines that much of the claim is unexhausted and procedurally barred, and, in any event, the entire claim lacks merit.

*Much of Petitioner's Ineffective-Assistance-of-Counsel Claim Is Procedurally Barred*

Respondent first argues that petitioner's ineffective-assistance-of-counsel claim is unexhausted and procedurally barred from federal habeas review. A prisoner must fully exhaust state remedies before seeking habeas relief in federal court. *See* 28 U.S.C. § 2254(b)(1)(A). This entails submitting the factual and legal basis of any claim to the highest available state court for review in a procedurally correct manner. *See Satterwhite v. Lynaugh*, 886 F.2d 90, 92-93 (5th Cir. 1989). "It is not enough that all the facts necessary to support the federal claim were before the state courts or that a somewhat similar state-law claim was made." *Anderson v. Harless*, 459 U.S. 4, 6 (1982) (citations omitted). Accordingly, the exhaustion requirement is not satisfied if a petitioner presents new legal theories or new factual claims in his federal habeas petition. *Ries v. Quarterman*, 522 F.3d 517, 523-24 (5th Cir.), *cert. denied*, 129 S.Ct. 485 (2008).

While a federal court has limited discretion to stay a habeas petition and hold it in abeyance so a prisoner can return to state court to exhaust his previously unexhausted claims, *see Rhines v. Weber*, 544 U.S. 269, 275 (2005), Texas law prohibits a prisoner from filing a second or successive application for post-conviction relief if the grounds stated

therein could have been, but were not, raised in a prior state writ. *See* TEX. CODE CRIM.

PROC. ANN. art. 11.07, § 4(a) (Vernon 2005). Under this statute:

> If a subsequent application for writ of habeas corpus is filed after final disposition of an initial application challenging the same conviction, a court may not consider the merits of or grant relief based on the subsequent application unless the application contains sufficient specific facts establishing that:
>
> (1) the current claims and issues have not been and could not have been presented previously in an original application or in a previously considered application filed under this article because the
> factual or legal basis for the claim was unavailable on the date the applicant filed the previous application; or
>
> (2) by a preponderance of the evidence, but for a violation of the United States Constitution no rational juror could have found the applicant guilty beyond a reasonable doubt.

*Id*. This procedural bar also applies to unexhausted claims if the state court would likely

dismiss a successive habeas petition under article 11.07, § 4. *See Coleman v. Thompson*,

501 U.S. 722, 735 n.1 (1991) (procedural default occurs when prisoner fails to exhaust

available state remedies and "the court to which the petitioner would be required to present

his claims in order to meet the exhaustion requirement would now find the claims

procedurally barred"). The TCCA applies the abuse-of-the-writ doctrine consistently and

strictly, and the Fifth Circuit has held that the doctrine is an adequate state procedural

bar for purposes of federal habeas review. *See Cotton v. Cockrell*, 343 F.3d 746, 755 (5th

Cir. 2003), *cert. denied*, 124 S.Ct. 1417 (2004); *Emery v. Johnson*, 139 F.3d 191, 195-96 (5th Cir. 1997).

The Supreme Court and Fifth Circuit have recognized exceptions to the procedural default doctrine in two limited circumstances: where a petitioner demonstrates "(1) cause for the procedural default and actual prejudice as a result of the alleged violation of federal law or (2) that failure to consider his claims will result in a fundamental miscarriage of justice." *Smith v. Johnson*, 216 F.3d 521, 524 (5th Cir. 2000) (quoting *Pitts v. Anderson*, 122 F.3d 275, 279 (5th Cir. 1997)); *see also Coleman*, 501 U.S. at 750. To establish cause, a petitioner must show that either an objective external factor prevented defense counsel from complying with state procedural rules or that the default was the result of ineffective assistance on the part of trial or appellate counsel. *Coleman*, 501 U.S. at 753-54; *Murray v. Carrier*, 477 U.S. 478, 488 (1986). The miscarriage of justice exception is "confined to cases of actual innocence, 'where the petitioner shows, as a factual matter, that he did not commit the crime of conviction.'" *Fairman v. Anderson*, 188 F.3d 635, 644 (5th Cir. 1999) (quoting *Ward v. Cain*, 53 F.3d 106, 108 (5th Cir. 1995)). In the context of a capital trial, the Supreme Court has held that a showing of "actual innocence" is made only when a petitioner shows by clear and convincing evidence that, but for constitutional error, no reasonable juror would have found the petitioner *eligible* for the death penalty under applicable state law. *Sawyer v. Whitley*, 505 U.S. 333, 346-48 (1992). As the Supreme Court noted in *Sawyer*, "the 'actual innocence' requirement must focus on those elements

that render a defendant eligible for the death penalty, and not on additional mitigating evidence that was prevented from being introduced as a result of a claimed constitutional error." 505 U.S. at 347.

In his state writ, petitioner argued that defense counsel rendered ineffective assistance by failing to uncover and introduce the following documentary evidence: elementary school records, medical records from his childhood physician, and 1974 counseling records. (St. Hab. Tr. at 22-23). According to petitioner, these records would have shown that, as a child, he suffered from learning problems, a rare condition that made him sensitive to weather changes, a tendency to burst blood vessels during times of emotional stress, difficulties with his father, and low self-esteem. (*Id.*). Petitioner argued that, had counsel discovered and introduced these records through proper custodians during the punishment phase of his trial, there is a reasonable probability that the jury would have found that sufficient mitigating circumstances existed to warrant a sentence of life imprisonment rather than death. (*See* St. Hab. Tr. at 31-32).

In his federal habeas petition, petitioner argues that counsel rendered ineffective assistance "by failing to conduct an investigation into the Petitioner's background for mitigation evidence, including but not limited to educational records, medical records and social history." (Fed. Pet. at 6). In support of this claim, petitioner attaches a report prepared at the request of federal habeas counsel by mitigation specialist Amanda S. Maxwell. (*See* Fed. Pet. at App. C). In his reply, petitioner specifies that he is not arguing

that counsel's failure to hire a mitigation specialist constituted ineffective assistance, but is instead claiming that counsel were ineffective for failing "to find and introduce both the school and medical records *and the vast additional body of mitigating evidence developed by federal habeas counsel's mitigation specialist*." (*See* Pet. Reply at 2 (emphasis added)).

Maxwell's report is based primarily on the "vast additional body of mitigating evidence" that went unmentioned in petitioner's state writ. Maxwell principally relies on information contained in affidavits from petitioner and his sister, Lesa Flores, presented for the first time in federal court. (*See* Fed. Pet. at App. C, Exhs. 3-6; *see also* Fed. Pet. at 7). In addition, Maxwell interviewed other lay witnesses and reviewed additional documentary evidence beyond that referenced in the state writ. (*See* Fed. Pet. at App. C, Exh. 5 "Appendix"). Maxwell's report also includes Maxwell's expert opinion that, had a mitigation expert been hired by defense counsel, the expert would have discovered and testified that petitioner exhibited various clinical syndromes and that his criminal behavior was modeled and reinforced by his parents. (*See* Fed. Pet. at App. C, Exh. 3, hereinafter referred to as "Findings").

As petitioner acknowledged in both his federal habeas petition and in his motion to stay and abate this proceeding, his federal ineffective-assistance-of-counsel claim far exceeds the scope of the claim presented at the state court level and is largely unexhausted. (*See* Fed. Pet. at 6 ("Ground One was not exhausted because there is substantially more evidence available than the limited evidence presented to the state court by the state habeas

counsel."); Mot. To Stay and Abate, 6/4/07, at 3 ("Movant concedes that under federal law, the first ground in his petition, though arguably raised in state court [,] was a pale shadow of the claim advanced in federal court.")). Petitioner's state-law claim was limited to the question of whether counsel was ineffective for failing to locate and present specific medical, counseling, and school records. Petitioner now claims for the first time that, in addition to failing to locate and present these specific records, counsel also failed to adequately interview various lay witnesses and present their testimony, failed to locate and present additional records, and failed to uncover and present expert testimony. No state court has had an opportunity to consider these new factual claims. Clearly, the portions of petitioner's ineffective-assistance-of-counsel claim related to counsel's alleged failure to investigate and introduce evidence beyond that found in the school, medical, and counseling records referenced in his state writ are unexhausted and procedurally barred.

Nor can petitioner overcome the procedural bar. The only cause advanced by petitioner for his failure to present the state habeas court with the far more expansive ineffective-assistance-of-counsel claim now before this court is "the miserable performance of his court appointed state habeas counsel." (Mot. To Stay and Abate [Doc. #14] at 9; *see also* Fed. Pet. at 6). However, the Fifth Circuit has consistently held that the ineffectiveness of state habeas counsel cannot serve as cause to overcome a procedural default. *Matchett v. Dretke*, 380 F.3d 844, 849 (5th Cir. 2004), *cert. denied*, 125 S.Ct. 1067 (2005). Nor can petitioner show that the Court's failure to address the unexhausted and

procedurally barred portions of his ineffective-assistance-of-counsel claim will result in a "fundamental miscarriage of justice." Because the claim relates solely to information petitioner alleges should have been presented as mitigating evidence, not evidence related to his *eligibility* for the death penalty, this court's failure to address the unexhausted portion of the claim cannot result in a "fundamental miscarriage of justice" sufficient to overcome the procedural bar. *See, e.g., Haynes v. Quarterman*, 526 F.3d 189, 195 (5th Cir. 2008); *see also Trevino v. Thaler*, 2009 WL 5196749 at *18-20 (W. D. Tex. Dec. 21, 2009).

The Court notes that, after respondent argued in his answer that petitioner's ineffective-assistance-of-counsel claim was procedurally barred, but described the claim as centering on counsel's failure to hire a mitigation specialist, (*see* Resp. Ans. at 12-15), petitioner contended in his reply that respondent had mischaracterized his argument. (*See* Pet. Reply at 3). Yet petitioner has made no attempt to explain how the unexhausted portions of his ineffective-assistance-of-counsel claim are not subject to the procedural bar. (*See* Pet. Reply at 1-5). To the extent petitioner seeks to evade the application of the procedural bar by arguing that respondent failed to properly raise the issue, he cannot do so. A court may raise the issue of procedural default *sua sponte* as long as the government has not intentionally waived the bar and the movant has been given notice of the procedural default and an opportunity to argue against the procedural bar. *See Smith v. Johnson*, 216 F.3d 521, 523-24 (5th Cir. 2000). In the instant case, petitioner preemptively addressed his failure to exhaust portions of his ineffective-assistance-of-counsel claim in both his

federal petition and motion to stay and abate this proceeding. (*See* Fed. Pet. at 6; Mot. to Stay and Abate, 6/4/07 [Doc. #14]). As respondent did not waive the argument and petitioner had both notice and opportunity to respond--and, in fact, did address the procedural bar issue in two separate documents filed with this court--this court may dismiss the unexhausted portions of the claim regardless of whether respondent failed to frame the issue correctly.

*Regardless of the Applicability of the Procedural Bar, Petitioner's Ineffective-Assistance-of-Counsel Claim Lacks Merit*

## 1.    Standard of Review

To successfully state a claim of ineffective assistance of counsel, a petitioner must demonstrate (1) that counsel's performance was deficient and (2) that the deficient perform-ance prejudiced his defense. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984). A failure to establish either prong of this test requires a finding that counsel's performance was constitutionally effective. *Id.* at 696. The Court may address the prongs in any order. *Smith v. Robbins*, 528 U.S. 259, 286 n.14 (2000).

In assessing counsel's performance, courts "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. 668, 689 (1984). In the context of a claim that trial counsel failed to investigate and present mitigating evidence, the court concentrates on such factors as what counsel did to prepare for sentencing, what mitigating evidence he gathered, what

additional "leads" he had, and what results he might have reasonably expected from those leads. *Neal v. Puckett*, 286 F.3d 230, 237 (5th Cir. 2002), *cert. denied sub nom. Neal v. Epps*, 123 S.Ct. 963 (2003). The court must "consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further." *Miller v. Dretke*, 420 F.3d 356, 361 (5th Cir. 2005), *quoting Wiggins v. Smith*, 539 U.S. 510, 521 (2003). "Absent some showing a counsel's subjective decision-making was objectively unreasonable in view of the information and evidence then available to counsel, it is almost impossible for a habeas corpus petitioner to overcome the presumption of reasonableness afforded his counsel's strategic and tactical decisions under *Strickland*." *Bartee v. Quarterman*, 574 F.Supp.2d 624, 649 (W.D. Tex. 2008), *aff'd*, 339 Fed.Appx. 429 (Jul. 31, 2009), *cert. denied*, ___ S.Ct. ___, 2010 WL 1006041 (Mar. 22, 2010).

To establish prejudice, a petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. The prejudice component of the *Strickland* test "focuses on the question whether counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair." *Williams v. Taylor*, 529 U.S. 362, 393 n.17 (2000) (citations and internal quotation marks omitted). Reviewing courts must consider the totality of the evidence before the finder of fact in assessing

whether the result would likely have been different absent the alleged errors of counsel. *Strickland*, 466 U.S. at 695-96. Where a petitioner alleges that counsel failed to investigate present mitigating evidence in a capital case, the court must "reweigh the evidence in aggravation against the totality of available mitigating evidence" presented at trial and during the habeas proceeding. *Wiggins*, 539 U.S. at 534. Petitioners must "affirmatively prove prejudice." *Strickland*, 466 U.S. at 693. They cannot satisfy the second prong of *Strickland* with mere speculation and conjecture. *Bradford v. Whitley*, 953 F.2d 1008, 1012 (5th Cir. 1992). Conclusory allegations, furthermore, are insufficient to obtain habeas relief. *Koch v. Puckett*, 907 F.2d 524, 530 (5th Cir. 1990).

*Additional Applicable Law*

Newbury analogizes his claim of ineffective assistance of counsel to those of defendants in three United States Supreme Court decisions holding that defense counsel unreasonably failed to investigate and present potentially mitigating evidence during the sentencing phase at trial: *Williams v. Taylor*, 529 U.S. 362 (2000), *Wiggins v. Smith*, 539 U.S. 510 (2003), and *Rompilla v. Beard*, 545 U.S. 374 (2005). In *Williams*, the Supreme Court held that Williams was denied his constitutionally guaranteed right to effective assistance of counsel when his attorneys failed to investigate and present substantial mitigating evidence during the sentencing phase of his capital murder trial. The Court found that the record established that counsel, *inter alia*: (1) had not begun to prepare for sentencing until a week before trial; (2) failed to present evidence available to them

that Williams did not advance beyond the sixth grade and was found to be "borderline mentally retarded;" and (3) failed to uncover juvenile and social services records "graphically describing Williams' nightmarish childhood, not because of any strategic calculation but because they incorrectly thought that state law barred access to such records." *Williams*, 529 U.S. at 395-96 (internal record citations omitted). The omitted records would have revealed that Williams' parents had been imprisoned for criminal neglect of Williams and his siblings, that Williams had been beaten by his father "severely and repeatedly," that Williams had been committed to the custody of the social services bureau for two years during his parents' incarceration and was placed in an abusive foster home, and that he was returned to his parents following their release from incarceration. *Id.* at 395. In a footnote, the Supreme Court included a sample description of Williams' deplorable childhood living conditions found in the unexamined juvenile records:

> The home was a complete wreck....There were several places on the floor where someone had had a bowel movement. Urine was standing in several places in the bedrooms. There were dirty dishes scattered over the kitchen, and it was impossible to step any place on the kitchen floor where there was no trash....The children were all dirty and none of them had on under-pants. Noah and Lula were so intoxicated, they could not find any clothes for the children, nor were they able to put the clothes on them....The children had to be put in Winslow Hospital, as four of them, by that time, were definitely under the influence of whiskey.

*Id.* at 396 n. 19 (citation to record omitted). The Court determined that trial counsel's omissions "clearly demonstrate[d] that trial counsel did not fulfill their obligation to conduct a thorough investigation of the defendant's background." *Id.* at 396. Noting

that the jury had been presented with evidence that Williams had turned himself in to police and expressed remorse for his criminal actions, the Court further held that these omissions prejudiced Williams, concluding that, while the information might not have overcome a finding of future dangerousness, "the graphic description of Williams' childhood, filled with abuse and privation, or the reality that he was 'borderline mentally retarded,' might well have influenced the jury's appraisal of his moral culpability." *Id.* at 397. Based on the entire post-conviction record, the Court concluded that the state trial judge was correct in holding that there was "'a reasonable probability that the result of the sentencing proceeding would have been different' if competent counsel had presented and explained the significance of all the available evidence." *Id.*

In *Wiggins*, the Court held that trial counsel's decision not to expand their investigation of their client's life history beyond the presentencing report and records of the Department of Social Services (DSS) was unreasonable and that counsel's inadequate investigation prejudiced the defendant. 539 U.S. at 523-38. The Court focused on whether counsel's investigation supporting their decision not to introduce mitigating evidence regarding their client's life history "was *itself* reasonable." *Id.* at 523. Before sentencing, a psychologist hired by counsel determined that Wiggins had an IQ of 79, had "difficulty coping with demanding situations," and "exhibited features of a personality disorder." *Id.* However, his report contained no information regarding Wiggins's life history. *Id.* The presentencing report included a one-page "personal history" containing references to Wiggins's "misery as a youth" and the fact that he spent most of his life in foster care.

*Id.* DSS records contained references to Wiggins's mother's alcoholism, his emotional difficulties while being "shuttled" among foster homes, frequent and lengthy absences from school, and at least one episode during which Wiggins and his siblings were left alone for days without food. *Id.* at 525. Despite this available information, counsel did not pursue additional evidence regarding Wiggins's background and instead relied on a theory that Wiggins did not kill the victim by his own hand at sentencing. *Id.* at 515-16. According to the Court, "counsel abandoned their investigation of petitioner's background after having acquired only rudimentary knowledge of his history from a narrow set of sources." *Id.* at 524. The Court found that this dereliction of duty was unreasonable both according to well-defined professional norms, which strongly suggested the development of reasonably available mitigating evidence related to family and social history in a capital case, and in light of the fact that the DSS records contained clear leads that would have led a reasonable attorney to investigate further. *Id.*

The Court further held that Wiggins had been prejudiced by this failure because, had counsel had a social history report prepared and/or followed up on the information contained in the DSS records, counsel would have uncovered and been able to present substantial mitigating evidence. During Wiggins's post-conviction appeal, Wiggins's new counsel hired a social worker who prepared a social-history report based on his review of state social services, medical, and school records, as well as interviews with Wiggins and his family members. *Id.* at 516. According to the report:

> [P]etitioner's mother, a chronic alcoholic, frequently left
> Wiggins and his siblings home alone for days, forcing them
> to beg for food and to eat paint chips and garbage. Mrs.
> Wiggins' abusive behavior included beating the children for
> breaking into the kitchen, which she often kept locked. She
> had sex with men while her children slept in the same bed and,
> on one occasion, forced petitioner's hand against a hot stove
> burner-an incident that led to petitioner's hospitalization. At
> the age of six, the State placed Wiggins in foster care.
> Petitioner's first and second foster mothers abused him
> physically, and, as petitioner explained to [the social worker],
> the father in his second foster home repeatedly molested and
> raped him. At age 16, petitioner ran away from his foster home
> and began living on the streets. He returned intermittently
> to additional foster homes, including one in which the foster
> mother's sons allegedly gang-raped him on more than one
> occasion. After leaving the foster care system, Wiggins entered
> a Job Corps program and was allegedly sexually abused by his
> supervisor.

*Id.* at 516-17 (internal record citations omitted). The Court held that there was a reasonable probability that at least one juror, confronted with the "excruciating life history" counsel failed to present, would have voted against the death penalty at sentencing. *Id.* at 537-38. This was particularly true given the fact that Wiggins, unlike the petitioner in *Williams*, did not have a record of violent behavior to offset the mitigating evidence. *Id.* at 538.

Then, in *Rompilla*, the Supreme Court held that trial counsel rendered deficient performance by failing to examine the court file on a prior conviction Rompilla received for rape and assault despite being on notice that the State intended to present evidence of this prior conviction at sentencing in Rompilla's capital murder trial. 545 U.S. at 383-386. The Supreme Court determined that, had counsel viewed this court file, counsel

would have discovered "mitigation leads" from the prison files, which indicated that Rompilla's history was very different from what Rompilla and his family had told trial counsel, including evidence of a childhood in a slum environment, a history of alcohol abuse, and previous psychological tests that pointed to schizophrenia and other disorders, as well as a low level of cognition. *Id*. at 390-91. Then, had counsel pursued these leads, counsel would have discovered that Rompilla's parents were severe alcoholics, their children were neglected, Rompilla was frequently physically abused by his father, and Rompilla suffered from organic brain damage and significantly impaired cognitive function. *Id*. at 391-92. The Court concluded that Rompilla was prejudiced by this failure because there was a reasonable probability that he would not have been sentenced to death had the jury heard this evidence. *Id*. at 393.

After the instant petition was filed, the Supreme Court granted habeas relief based on an attorney's failure to uncover and present mitigating evidence in a fourth case, *Porter v. McCollum*, 130 S.Ct. 447 (2009). The Supreme Court based its decision on counsel's failure to present evidence of: "(1) [the petitioner's] heroic military service in two of the most critical-and-horrific-battles of the Korean War, (2) his struggles to regain normality upon his return from war, (3) his childhood history of physical abuse, and (4) his brain abnormality, difficulty reading and writing, and limited schooling." *Id*. at 454. As the Court's focus was primarily on the petitioner's Korean War experience, much of *Porter* is not applicable to the instant case. However, it is worth nothing that, as in *Williams*, *Wiggins*, and *Rompilla*, the omitted mitigation evidence included both a history of the

petitioner's father's extreme violence towards him and a finding of brain damage. *Id.* at 449-51. Also, there was significant evidence of counsel's deficient performance: counsel failed to obtain any of the petitioner's school, medical, or military service records, and did not interview any of petitioner's family members. *Id.* at 453. The Court contrasted this evidence of counsel's deficient performance with the evidence presented in another recent case, *Bobby v. Van Hook*, ___ U.S. ___, 130 S.Ct. 13 (2009), in which the Court held counsel's performance was not deficient because he gathered a great deal of mitigating evidence and then made the reasonable decision not to pursue additional sources. *Id.* at 18-19.

## 2.    The Case Presented at Punishment

*The State's Case*

During the punishment phase of petitioner's trial, the state introduced evidence showing that petitioner had three prior convictions for aggravated robbery: one in 1981 for which he received a ten-year prison sentence, (R. 55:10-17), one in 1987 for which he received a fifteen-year prison sentence, (R. 55:69-91), and one in 1998 for which he received a ninety-nine year prison sentence, (R. 55:95-122). (*See also* R. 53:3-7). Petitioner used a gun to intimidate his victims during all three of these robberies. (R. 55:12-13, 85-86, 97-98). The evidence also showed that after his escape from prison, petitioner, along with one other "Texas 7" escapee, committed two armed robberies in Houston during which store employees were bound and threatened with death before committing the armed

robbery at Oshman's that resulted in his capital murder conviction. (R. 53:12-13, R. 54:84-107, 115-26, 129-49).

Patrick Moczygemba described the circumstances of the "Texas 7" prison escape. (R. 53:14, 23). On December 13, 2000, six of the seven escapees were working under Moczygemba's supervision in the TDCJ Connally Unit maintenance department. (R. 53: 14, 22-23). After one of the "Texas 7" escapees duped Moczygemba into leaning down, Moczygemba was struck in the head and knocked unconscious. (R. 53:48-49, 53). When Moczygemba regained consciousness, one of the escapees was holding a shank to his head and told him to "[s]top struggling or we'll end it now." (R. 53:49-51). After stealing Moczygemba's clothes, the escapees bound and gagged him and placed him in a room that they ultimately filled with thirteen other bound prison employees. (R: 53:51-56, 58, 75-76). Moczygemba testified that petitioner tried to enter the room as some of the other bound hostages were starting to break free. (R. 53:62-64). The hostages pushed against the door to keep petitioner from entering, but he waved a "shank" at them with the arm that was stuck in the door and tried to stab anything within reach. (R. 53: 57, 61-65). Moczygemba observed that each of the seven escapees was actively participating and had a role in the escape. (R: 53:56-57). During his altercation with the escapees, Moczygemba sustained a head injury and cuts to his scalp, and his ear was severed nearly in half. (R. 53:72).

Alejandro Marroquin, another Connally Unit employee, testified that, on the day of the break-out, he was surrounded by six escapees, including petitioner, and knocked

down by a sharp blow to the head. (R. 53:90-91, 99). Petitioner held a "shank" with a twelve-inch blade to Marroquin's throat as another escapee threatened him with death if he resisted. (R. 53:100-02). The escapees directed Marroquin to crawl to the room where the other hostages were being held, and petitioner and another escapee kicked him from behind as he crawled to the room. (R. 53:102-03). The escapees bound him and then attempted to gag him. (R. 53:104). When Marroquin resisted the gag, petitioner struck him three or four times with his bare fist until he went unconscious. (R: 53:104-06). During the attack, Marroquin received a broken nose and thumb, a separated shoulder, a black eye, and several bruises. (R. 53:115). Other prison employees' accounts of petitioner's acts during the escape echoed those of Moczygemba and Marroquin: one testified that petitioner held a "shank" to his throat, (R. 53:148-49), and another stated that petitioner placed him in a headlock and then threw him face-down on the ground, pulled him up by the hair, and struck him hard twice in the face. (R. 54:23-26).

The state also introduced other evidence related to petitioner's prior violence while incarcerated. John Keller, a former correctional officer at the Travis County Jail, testified that petitioner participated with two other inmates in a coordinated attempt to escape from the Travis County Jail in 1981. (R. 55:20-29). During the attempt, petitioner grabbed Keller and held a broken fluorescent tube to Keller's throat, causing a cut before the attempt was foiled by other officers. (R. 55:25-27). In addition, while imprisoned between 1981 and 1985 and again between 1987 and 1988, petitioner was disciplined for several infractions, including a total of eleven instances of fighting without a weapon.

45

(R. 55:36-51, 59-65). On cross-examination, Keller admitted that petitioner was not the leader of the escape attempt. (R. 55:29).

*The Defense's Case*

The defense first presented petitioner's father, Kenneth Donald Newbury. Petitioner's father testified that his job kept him on the road most of the time and that he was only home two or three days per month during petitioner's childhood. (R. 55:132, 136-37). He also admitted that he was a heavy drinker for much of the time that petitioner lived with him. (R. 55:140). Petitioner's father acknowledged that he "probably wasn't very good" as a father. (R. 55:139). He stated that while he provided for the family financially, he failed to provide emotional support. (*Id.*). When petitioner was approximately twelve years old, petitioner's mother divorced petitioner's father and moved to Texas, after which petitioner had very little contact with his father. (R. 55:138-39; *see also* R. 56:11).

Petitioner's sister, Lesa Flores, testified that she and petitioner were raised primarily by their mother and grandmother. (R. 56:5, 9). According to Flores, the grandmother, who watched petitioner and her while their mother was at work, physically and emotionally abused both children. (R. 56:18). The grandmother "despised" and "completely shunned" petitioner and favored Flores. (R. 56:18, 20). For example, the grandmother gave Flores, but not petitioner, Christmas gifts. (R. 56:19). The grandmother also picked up anything that was light enough to use as a weapon and hit petitioner with it. (R. 56:19). The grandmother broke the children's toes "quite frequently," particularly when Flores interfered

with fights between petitioner and her. (R. 56:34). This abuse continued until petitioner was 15 or 16 years old. (R. 56:29).

Flores's and petitioner's parents tried to teach them right from wrong and imposed discipline in the house. (R. 56:17). Petitioner's mother disciplined the children by spanking them with her hand and sending them to their rooms. (R. 56:17). Petitioner's father spanked both children with a "very thick leather belt" when they misbehaved. (R. 56:17). Petitioner's parents did not get along with each other and got into physical altercations in front of their children. (R. 56:33-34). Flores recalled one episode during which her father dragged her mother upstairs by the hair in front of the children. (R. 56:33-34). Flores also recounted an incident from petitioner's childhood in which a friend of petitioner was shot while he and petitioner were handling a gun. (R. 56:22-23). Petitioner was in shock immediately after the incident. (R. 56:23).

Petitioner's family moved to a mobile home park in Missouri when petitioner was a toddler, and the family lived in Missouri during petitioner's elementary school years. (R. 56:7, 9). Flores testified that petitioner had a hard time sitting still for class and, as a result, got in trouble between kindergarten and third grade. (R. 56:10). On occasion, Flores had to help teachers make petitioner return to the classroom when he wanted to play instead of work. (R. 56:10). Ultimately, petitioner was placed on Ritalin for hyperactivity while in Missouri. (R. 56:10, 30). At age 12, petitioner's parents separated, and petitioner moved to Texas with his mother and sister. (R. 56:11) Petitioner dropped out of school when he was 16 and moved in with his father in Arkansas for six months

before returning to Austin. (R. 56:13-14). After returning to Texas, petitioner helped Flores through the birth of her first child and had a good relationship with her children before he went to the penitentiary at age 18. (R. 56:14-16). Flores and petitioner remained close despite his convictions. (R. 56:24-26). During cross-examination, Flores acknowledged that, despite his "learning disorder," petitioner's intelligence was "fine," and he had job skills. (R. 56:31-32). She also informed the jury that petitioner's mother had taken him to doctors and the family had attended counseling sessions in an effort to help petitioner. (R. 56:30).

Petitioner's 20-year-old stepson, Larry Jones Washington, Jr., testified that petitioner helped him turn his life around after he got in trouble for theft and possession of an illegal substance as a teenager. (R. 56:36, 40-41). Petitioner's 18-year-old stepdaughter, Marquita Washington, stated that petitioner was like a father to her and had warned her after an incident at school that she could end up in prison like he had if her bad behavior continued. (R. 56:47, 50). Petitioner's 15-year-old stepdaughter, Andrea Washington, testified that petitioner treated her like his child and talked to his stepchildren about right and wrong, telling them that he had been in jail for doing the wrong things and did not want the same for them. (R. 56:57-58). All three stepchildren testified that petitioner had had a positive influence on their mother when he was with her, but that she had regressed to a lifestyle of heavy drinking and drug use since petitioner's incarceration. (R. 56:43-44, 51-52, 58).

Petitioner's wife, Jackie Newbury, testified that petitioner married her even though he was aware that she had five children and had been diagnosed with AIDS. (R. 56:60-61).

48

Prior to the marriage, while Jackie was incarcerated, petitioner anonymously gave money and most of his own furniture to Jackie's mother and children after their house burned down. (R. 56:65-67). Although Jackie and petitioner fought over her substance abuse problems during their marriage, petitioner eventually helped her quit using drugs, reduce the amount of alcohol she drank, and improve her relationships with her children. (R. 56:61-63). Petitioner did not drink or use drugs, worked hard to provide for the family, and was a good influence on her children. (R. 56:64-65). Jackie had never observed petitioner to have any mental problems. (R. 56:79-80).

Finally, Keith Price, warden of the TDCJ Clements Unit, described the layout and security measures in place in maximum security prisons. (R. 56:84-110). He stated that petitioner would start out in the most restrictive administrative segregation possible and that the level of security would be lowered only if he followed the rules. (R. 56:101). Even then, petitioner would likely remain in administrative segregation--23 hours a day in a one-person cell--for "many, many years." (R. 56:101-02, 107). Price also reported that Texas has upgraded the security of its prisons significantly since the "Texas 7" escape. (R. 56:103-104). At the conclusion of the defense's case, petitioner opted not to testify on his own behalf. (R. 56:125).

### 3.    Review of Exhausted Portion of Claim on the Merits

As he did in his state writ, petitioner criticizes his attorney for failing to "uncover and introduce" the following records during the punishment phase of his trial: (1) medical records from Dr. William Legg, who treated petitioner when he was a small child; (2) school

records from the North Kansas City Public Schools reflecting his performance between kindergarten and third grade; and (3) 1974 counseling records from the Tri-County Community Mental Health Center in North Kansas City, Missouri. (St. Hab. Tr. at 22-31, 264-282 (App. 8 & 9); Fed. Pet. at 6 & attached pp.1-7). Turning first to the medical records, Dr. Legg stated in an affidavit presented during petitioner's state habeas proceedings that his medical records were destroyed upon his retirement in 1999, the year before petitioner committed his capital offense. (St. Hab. Tr. at 359). Counsel cannot be faulted for failing to investigate and present evidence that no longer existed at the time he represented petitioner. Nor can petitioner even begin to show that he was prejudiced by counsel's failure to introduce these records given that their contents are unknown. Petitioner is thus not entitled to relief based on counsel's failure to investigate and introduce Dr. Legg's medical records.

With regard to the school and counseling records, petitioner has not presented any evidence of counsel's decision-making process related to counsel's alleged failure to uncover these records and introduce them to the jury. As discussed in *Bartee*, it is "almost impossible" for petitioner to overcome the presumption of reasonableness accorded counsel's decision-making process without such evidence. 547 F.Supp.2d at 649. There is no evidence that counsel failed to spend sufficient time investigating petitioner's case like the attorneys in *Wiggins*, nor has petitioner pointed to any obvious leads counsel failed to pursue that would have generated substantial new evidence of a type not introduced at trial, as was the case in *Rompilla* and *Williams*. In fact, the only evidence before the

Court shows that counsel's investigation into petitioner's background was substantial. Counsel successfully introduced a great deal of uncontroverted testimony from petitioner's father and sister, the only surviving adult members of the family in which petitioner was raised, regarding petitioner's childhood struggles at school and at home. (*See, generally*, R. 55:132-39; R. 56:5-34). They also presented extensive testimony from his wife and three stepchildren about the positive impact he had on their family. (*See, generally*, R. 56:36-80). Given the substantial evidence already available to them, counsel may have reasonably ceased their investigation before gathering the records like the defense counsel in *Bobby*. Counsel may have had access to the records and decided not to introduce them because, as discussed below in the context of the *Strickland* prejudice prong, the additional evidence in the records was either cumulative of trial testimony, insignificant, or detrimental to petitioner's case. Without any evidence to overcome the presumption of reasonableness afforded counsel's strategic decision-making, the Court cannot conclude that their performance was constitutionally deficient. *See, e.g., Moore v. Quarterman*, 534 F.3d 454, 468 (5th Cir. 2008) (denying *Strickland* claim where petitioner failed to provide "*any evidence at all* regarding the thought process underlying his trial counsel's decisionmaking").

Even if petitioner could somehow show that counsel rendered deficient performance with regard to the school and counseling records, he cannot satisfy the *Strickland* prejudice prong. In his state writ, petitioner argued that the school records would have shown he "suffered from learning problems as a child." (St. Hab. Tr. at 22). Specifically, he cited to teachers' notations that he: "has a hard time learning words," "has shown little interest

in learning," "has not shown much improvement in reading," "has been recommended for remedial reading," and "hasn't accomplished much this year because of his poor attitude and resulting poor work habits." (St. Hab. Tr. at 23 (citing St. Hab. Tr. at 266)). Petitioner also claims that one of his teachers wrote that he was "unable to do good work," (St. Hab. Tr. at 23; Fed. Pet. at 5), but this statement is a misquoted version of the last entry in the records, in which petitioner's third grade teacher wrote that petitioner was "*able* to do good work," but that he "has poor work habits." (St. Hab. Tr. at 266 (emphasis added)).

Petitioner's sister testified during the punishment phase of trial that petitioner's hyperactivity interfered with his schoolwork between kindergarten and third grade and that he was placed on Ritalin to combat this "learning disorder." (R. 56:10-11, 30-31). At best, the teachers' comments in the school records would have been cumulative of this testimony. At worst, they would have been damaging to petitioner's case. The teachers' comments stress petitioner's negative attitude and lack of interest in school rather than a learning disability over which he had no control. Petitioner's third-grade teacher ultimately concluded that petitioner was capable of performing well in school, but chose not to. (St. Hab. Tr. at 266). In addition, the school records reflect that petitioner scored 106 and 91 on I.Q. tests, well within the normal range. (St. Hab. Tr. at 266); *see also Eldridge v. Quarterman*, 325 Fed.Appx. 322, 324 (5th Cir. Apr. 28, 2009), *cert. denied*, 130 S.Ct. 536 (2009) (according to definition of mental retardation used by Texas courts, one of requirements for showing "mental retardation" is an IQ score of below 70). Rather than

garnering sympathy for petitioner, the test scores and teachers' comments would have left the jury with the impression that, as in his adult life, petitioner *chose* to defy authority at an early age instead of working to develop his skills and abilities.

Petitioner also argues that the school records would have benefitted him because they contain a note signed by the principal documenting a phone conversation with Dr. Legg in December of 1968, when petitioner was six years old, in which the physician apparently told the elementary school principal that petitioner suffered from "a rare and very critical condition in which he cannot tolerate changes of temperature, low temperature, high humidity, windy conditions[,] etc." and "does burst blood vessels during emotional stress situations." (Fed. Pet. at attached pp. 5-6; St. Hab. Tr. at 23; *see also* St. Hab. Tr. at 267 (documenting petitioner's birthdate of May 18, 1962)). In an affidavit presented to the state habeas court, Dr. Legg stated that he has no independent recollection of petitioner's condition and that the comment that blood vessels burst meant only that petitioner's face turned red during stressful situations. (St. Hab. Tr. at 359). Particularly in light of this clarification, the notation would not have assisted petitioner in any material way had it been presented to the jury. Certainly, there is nothing remarkable about someone's turning red in the face in response to emotional stress. There is also no evidence that petitioner's inability to tolerate certain types of weather caused any major difficulties or persisted beyond his very early childhood. The notion that the jury would have found petitioner any less morally culpable for his role in the killing of a police officer because

he could not tolerate various weather conditions and turned red in the face when placed under stress as a six-year-old strains credulity.

Petitioner was also not prejudiced by counsel's failure to introduce the 1974 counseling records. In his federal petition, as in his state writ, petitioner claims that these records would have shown that he was diagnosed as hyperactive, was taking Ritalin, had a learning disability, and was participating in a remedial reading course. (Fed. Pet. at attached p. 6; St. Hab. Tr. at 23). Petitioner further asserts that the counseling records would have revealed that his father was authoritarian and that he, his mother, and his sister were afraid to confront his father. (*Id.*). Finally, he argues that the records would have revealed to the jury his feelings of rejection by his peers as a child and the fact that he told a counselor that no one liked him, including himself. (*Id.*)

Much of the evidence in the counseling records would have been cumulative of the testimony presented at trial. As discussed above, petitioner's sister presented extensive undisputed testimony regarding his difficulties in school and, in particular, his hyperactivity and the fact that he was prescribed Ritalin. (R. 56:10-11, 13-14, 30-31). The counseling records would not have added significantly to this testimony. The jury also had compelling and specific live testimony of petitioner's father's dysfunctional role in the family before it: petitioner's father admitted that he "probably wasn't very good" as a father, that he was a heavy drinker who did not support the family emotionally and was absent a great deal of the time, and that he had very limited contact with petitioner from the time petitioner was twelve years old; in addition, petitioner's sister testified that petitioner's

father spanked her and petitioner with a "very thick leather belt" and was physically abusive towards their mother. (R. 55:136-40; R. 56: 17, 33-34). The brief references to petitioner's difficulties with his father contained in the counseling records pale in comparison to this testimony. (*See, e.g.,* St. Hab. Tr. at 272 (father seen as "critical, rigid person"), 275 (father's approach described as "authoritarian"); 277 (mother reports "great deal of friction" between petitioner and his father).

The only potentially mitigating evidence in either the school and counseling records that counsel did not explore at trial were petitioner's feelings, noted in the counseling records, that no one liked him, including himself, and the fact that he was diagnosed with depressive neurosis during the counseling. This evidence does not begin to suggest that petitioner experienced anything even remotely similar to the extreme abuse and neglect suffered by the petitioners in *Rompilla*, *Wiggins*, and *Williams*. Feelings of rejection and low self-esteem are not uncommon among adolescents. Regarding the diagnosis of depressive neurosis, this condition was a secondary diagnosis to his hyperactivity, and the symptoms exhibited were not severe. (St. Hab. Tr. at 278). According to the counseling records, the condition did not impair petitioner's judgment, and his depressed mood was only "moderate." (*See id.*). There is also no evidence that petitioner suffered from this condition at any time after 1974. None of the defense witnesses mentioned that petitioner exhibited any signs of depression, and petitioner's wife specifically noted that she had never observed petitioner to have any mental problems. (R. 56:79-80). Finally, neither the depressive neurosis diagnosis nor petitioner's pre-teen self-esteem issues

gives any context for petitioner's involvement in the killing of a police officer, provides an explanation for the fact that he committed six armed robberies and engaged in a premeditated and violent prison escape, or suggests that he should bear less moral culpability for any of these actions. Moreover, the counseling records contain information that would have worked to petitioner's detriment. The counseling records reflect that petitioner viewed his mother and sister as "warm and accepting." (St. Hab. Tr. at 272). They also reveal that petitioner's sister was supportive of him and that petitioner's mother was an involved parent who communicated with teachers and was sufficiently motivated as a parent to initiate family counseling for petitioner's benefit. (St. Hab. Tr. at 272, 275-76). This evidence would have conveyed to the jury that petitioner lived with at least two caring and supportive family members throughout his childhood. In fact, the records also show that petitioner's father attended at least two counseling sessions, indicating that even he was not entirely neglectful. (St. Hab. Tr. at 275). Furthermore, one of the counselors reports in the records that "the family ha[d] a tremendous investment in scapegoating father." (St. Hab. Tr. at 272). This statement might have led the jury to discount petitioner's sister's testimony regarding her father's abusive behavior. Finally, perhaps most damaging is what is *not* included in the records. The counseling records, which contain detailed notes of at least two separate family counseling sessions, do not contain a single reference to petitioner's grandmother. (St. Hab. Tr. at 271-82). Yet Flores testified that the most extreme physical and emotional abuse suffered by petitioner came at the hands of petitioner's grandmother, who allegedly

56

began mistreating petitioner when he was only three years old and lived with the family off and on for most of their lives. (R: 56:17-20, 29). The fact that petitioner evidently never mentioned his grandmother in counseling would have raised doubts about this testimony.

For all of these reasons, the Court determines that the introduction of the school and counseling records would not have tipped the balance of evidence in favor of mitigation. Therefore, petitioner has not shown that he was prejudiced by counsel's failure to investigate and introduce these records, and the state habeas court's denial of petitioner's ineffective-assistance-of-counsel claim was not unreasonable. Accordingly, petitioner's claim that counsel was ineffective for failing to uncover and introduce the medical, school, and counseling records identified in his state writ is denied.

## 4. Review of Unexhausted Portion on the Merits: Deficient Performance Prong

Even if the Court considers the unexhausted portion of petitioner's ineffective-assistance-of-counsel claim on the merits, it fails. Petitioner claims that counsel was ineffective for failing to present a litany of evidence related to his social history now submitted in Maxwell's report. (Fed. Pet. at 6; Pet. Reply at 2). Maxwell's report is based primarily on facts gleaned from affidavits supplied to her by Flores and petitioner. Maxwell, a Licensed Master Social Worker, also asserts that an expert would have testified that petitioner suffered from a number of syndromes based on the evidence collected in her report. (*See* Fed. Pet. at App. C, Exh. 3 ("Findings")). Finally, Maxwell references documentary evidence beyond the medical, school and counseling records identified in

petitioner's state writ. With regard to all of these sources, petitioner has not shown that counsel's failure to introduce any additional mitigation evidence constituted deficient performance.

As an aside, Maxwell states that she also interviewed the following people while preparing her report: Kenneth Donald Newbury (petitioner's father), Dorothy Williams (petitioner's mother-in-law), Marie Smith (petitioner's stepdaughter), Charles Washington (petitioner's stepson), Jackie Cherico (petitioner's sixth-grade teacher), and Joan Jeide (petitioner's wife). However, Maxwell does not specify what, if any, information in her report came from these sources. (*See* Fed. Pet. at App. C, Exh. 4 (citing to sources used in the "Life History Timeline")). To the extent petitioner is arguing that counsel was ineffective for failing to present additional testimony from any of these individuals, he cannot prevail on this claim because he has not submitted evidence that these witnesses would have been willing to testify regarding any new information at his trial or what that testimony would have been. *See, e.g., Day v. Quarterman*, 566 F.3d 527, 538 (5th Cir. 2009) (to prove counsel ineffective for failing to call a witness, petitioner must "name the witness, demonstrate that the witness was available to testify and would have done so, set out the content of the witness's proposed testimony, and show that the testimony would have been favorable to a particular defense").

a. New Evidence from Petitioner's Sister

Petitioner now asserts that counsel failed to adequately investigate and present additional mitigation evidence from his sister, Lesa Flores. In support of this claim,

petitioner submits two new affidavits as exhibits to Maxwell's report. In one of the affidavits, Flores presents the mitigation evidence that counsel allegedly failed to discover and present. (Fed. Pet. at App. C, Exh. 6 ("DECLARATION OF LESA FLORES"), hereinafter referred to as "Flores Aff."). In the other affidavit, Flores describes her interactions with counsel prior to trial:

> I met with Keith's trial lawyers one time before trial. Mr. Brooks and Mr. Parks came to San Marcos and met me at a Holiday Inn Express in the continental breakfast area. This meeting was [in] a very public place and I did not feel like I could talk about confidential matters. We talked for about 30-45 minutes. I was told that their PI might contact me. They told me he only had one leg and that I should make it easy on him as far as where we met. I never heard from him.

> I spoke with Mr. Parks again for about 10 minutes before I took the stand to testify in the punishment phase of Keith's trial. He told me not to play up or to explain the shooting that happened when Keith was twelve.

> I was never contacted by any other member of Keith's defense team.

(Fed. Pet. at App. C, Exh. 6 ("Lesa Flores Declaration")).

Even assuming Flores's account of counsel's interactions with her is valid, petitioner has not demonstrated that counsel's investigation was deficient. Although Flores now claims that she felt uncomfortable discussing "confidential matters" during the meeting because of its public location, (*id.*), she does not begin to explain which "confidential matters" she was reluctant to discuss, and there is no evidence that counsel was aware or should have been aware of her discomfort during the interview. On the contrary, the targeted questions asked by counsel during his direct examination of Flores indicate that

she discussed intimate family details with counsel before trial. (*See, e.g.,* R. 56:17 (in pursuing information about petitioner's grandmother's abusive behavior, counsel asked, "What other kinds of discipline would be invoked *and by whom there in the home*?" (emphasis added); R. 56:18 (asking how the grandmother would differentiate between Flores and petitioner at Christmastime)). Flores also does not explain why she could not have conveyed any information she was unwilling to discuss publicly with petitioner's attorneys through other means. For example, rather than opting not to share critical facts at all, she could have sent counsel a letter containing the information.

Moreover, during the punishment phase of trial, counsel asked Flores a series of broad, open-ended questions aimed at eliciting mitigating evidence, giving her multiple opportunities to testify regarding petitioner's life history and family background. (*See, generally*, R. 56: 5-35). At one point, counsel asked Flores the very broad question of whether petitioner appeared to be a "pretty normal, active child," to which Flores responded, "Yes." (R. 56:11). Flores could have disclosed a number of additional facts set forth in her affidavit in response to this question or any number of other questions posed by counsel. For example, the most compelling new evidence Flores presents is that petitioner attempted to hang himself when he was eight years old, behavior not indicative of a "normal" child. (Flores Aff. at 5). Flores's failure to disclose additional evidence, either before trial or during counsel's extensive trial examination of her, does not render counsel's performance deficient. The Fifth Circuit "has consistently refused to hold attorneys responsible for introducing mitigation evidence that their client and other witnesses fail

to disclose." *Johnson v. Cockrell*, 306 F.3d 249, 252-53 (5th Cir. 2002); *see Soria v. Johnson*, 207 F.3d 232, 250-51 (5th Cir. 2000); *West v. Johnson*, 92 F.3d 1385, 1408-09 (5th Cir. 1996).

Furthermore, the most relevant mitigation evidence now proffered by Flores is either redundant of Flores's trial testimony or elaborates on the themes explored during her trial testimony. For example, Flores describes her father's use of a belt to discipline as she did at trial, but now adds that petitioner's father swung the belt buckle at petitioner's head and hit him all over his body with the belt and belt buckle, once pushed petitioner's hand into dog excrement, and kicked petitioner in the groin. (Flores Aff. at 3). Flores revisits the subject of the grandmother's emotional and physical abuse of petitioner, but adds new details, such as a story that petitioner's grandmother told him he was going to die when he had the mumps. (*Id.* at 3). She also returns to the subject of petitioner's difficulties in school, but points out new facts such as that he was retained in first grade and was placed in special education for reading. (*Id.* at 4). Counsel was not deficient for not bringing these extra specifics to light at trial. *See Carty v. Thaler*, 583 F.3d 244, 264 (5th Cir. 2009) (even where trial counsel failed to conduct thorough interviews of witnesses before trial, counsel not deficient where petitioner's claim "boiled down to a matter of degrees-she wanted these witnesses to testify in greater detail about similar events and traits").

Finally, the most specific complaint that petitioner makes with regard to Flores's testimony is that counsel "brought up through Lesa Flores the fact that petitioner shot

61

his best friend with a .22 caliber rifle," but "did not develop either the character of petition's reaction to the shooting or that the shooting was an accident." (Fed. Pet. at attached p. 3). These allegations are not supported by the record. While counsel questioned Flores about the shooting incident, he deftly avoided revealing the fact that petitioner shot the gun. (R. 56:20-23). Counsel also elicited testimony from Flores that petitioner reacted with "shock." (R. 56:23). The facts elicited by counsel strongly suggested the shooting was accidental. According to Flores's account of the incident, the two boys were inseparable playmates and were alone with the gun in a small utility room, only one shot was fired that injured petitioner's friend in two places, Flores heard a pinging noise coming from the utility room, and both boys came to Flores together and told her, "He's been shot." (R. 56:21-22). The jury likely surmised from this testimony that the shooting was accidental and that at least some of the damage was caused by a ricocheting bullet. Petitioner criticizes counsel for not presenting the following additional facts regarding the accidental nature of the shooting through Flores's testimony: Flores now says that petitioner thought the gun was not loaded and was showing off for his friend when he shot the gun, that the gun ricocheted off the wall and went through the friend's arm, and that petitioner felt "horrible" about the incident. (Flores Aff. at 7). Again, to the extent petitioner is faulting counsel for not bringing to light more specific facts about an event, his claim must fail. *See Carty*, 583 F.3d at 264. Moreover, Flores, who admits she was not in the room at the time of the shooting, has no personal knowledge of these facts. Had counsel had attempted to present this evidence, it would have been excluded.

Therefore, counsel cannot be faulted for failing to present this additional evidence related to the shooting. For all of these reasons, the Court concludes that counsel's investigation and presentation of evidence from Flores was not constitutionally deficient.

b.      New Evidence from Petitioner

Petitioner also apparently faults counsel for not discovering and introducing facts presented in an affidavit recounting his life history signed by him and attached to Maxwell's report. (*See* Fed. Pet. at App. C, Exh. 6 ("DECLARATION OF DONALD KEITH NEWBURY"), hereinafter referred to as "Pet. Aff."). In his affidavit, petitioner complains that the private investigator hired by counsel only met with him two or three times and "only wanted to talk to [him] about Jesus." (Pet. Aff. at 11). Even assuming this allegation is true, petitioner does not explain what efforts *counsel* took to gather mitigating facts from him, whether counsel were aware of the facts presented in his new affidavit, or why, if counsel were not aware of the facts presented in his affidavit, petitioner did not make them aware of the information. In fact, the only evidence available to the Court related to the thoroughness of counsel's investigation suggests that counsel's performance was constitutionally adequate: counsel presented a substantial mitigation case and, when asked by the trial judge at the conclusion of the punishment phase whether there was "[a]ny stone that has not been turned over [by counsel] on [his] behalf," petitioner replied, "I believe all the stones have been turned and returned and turned again." (R. 56:126). Without any evidence to rebut the presumption of reasonableness to which counsel's

strategic decision-making is entitled, the Court cannot conclude that counsel was deficient for failing to investigate and introduce the evidence in petitioner's affidavit.

Even if petitioner could show that counsel did not take adequate steps to gather evidence from him, petitioner does not begin to explain how counsel could have introduced the testimony proffered in his affidavit. Petitioner elected not to testify at trial. (R. 56:125). Had counsel attempted to introduce the evidence in the affidavit presented by petitioner through other witnesses, it would undoubtedly have been excluded as inadmissible hearsay. Accordingly, the Court cannot conclude that counsel's failure to investigate or present the evidence in petitioner's affidavit constituted deficient performance.

c.     Expert Testimony

Petitioner argues that counsel was inadequate for failing to present evidence from a qualified expert who would have testified that petitioner suffered from the following: (1) severe learning disability; (2) attention deficit and hyperactivity disorder; (3) post-traumatic stress syndrome; (4) attachment disorder, (5) sensory integration disorder; and (6) depressive neurosis, also known as "dysthymic disorder." (*See* Fed. Pet. at App. C, Exh. 3 (portion entitled "Findings"), hereinafter referred to as "Findings"). He also asserts that an expert would have assisted him by explaining to the jury that petitioner's criminal behavior was modeled and reinforced by his parents. (*See id.*). Again, petitioner has not presented any evidence regarding counsel's decision-making with respect to the use of

a psychological expert.  As discussed below, the Court cannot determine that counsel's decision not to present the proposed expert testimony was unreasonable.

The Court initially notes that counsel introduced evidence of petitioner's childhood learning difficulties and hyperactivity through Flores's testimony.  (R. 56:10-11, 13-14, 30-31).  Additional expert testimony on these topics would merely have been cumulative of Flores's testimony.  Likewise, Maxwell's diagnosis of post-traumatic stress syndrome is based on the fact that petitioner was subjected to "extreme physical abuse by his father and grandmother starting at age three" and the fact that he witnessed "violent physical attacks on his mother on a regular basis."  (Findings at 5).  Counsel elicited testimony from Flores about petitioner's grandmother's emotional and physical abuse of petitioner and petitioner's father's harsh discipline and abusive treatment of petitioner's mother. (R. 56:17, 33-34; R. 56:18-20, 34).  While an expert might have been able to retrospectively add the label of "post-traumatic stress syndrome" to describe petitioner's reaction to these events, this information would not have added appreciably to the jury's understanding of petitioner's childhood plight and would have essentially been cumulative of Flores's testimony.  Therefore, counsel's failure to introduce expert testimony regarding petitioner's learning disabilities, attention deficit and hyperactivity, and Post Traumatic Stress Syndrome did not constitute deficient performance.

Turning to Maxwell's diagnosis of attachment disorder, this diagnosis is premised primarily on Flores's recollection, presented for the first time in her affidavit, that petitioner's mother told Flores, "This is your baby," when she was two years old, that

petitioner did not like to be touched as a young child, and that petitioner's mother felt rejected by her child. (Findings at 4). There is no evidence that Flores shared this information with counsel during pretrial interviews or that counsel was to blame for her failure to do so. Even if Flores had shared her account of petitioner's infancy with counsel, he might have reasonably doubted her ability to recall events that occurred when she was a two-year-old in the 1960s and concluded that hiring an expert to extrapolate a diagnosis based on these recollections would not have aided petitioner's cause. None of the evidence that was available to counsel, including the 1974 family therapy records, indicates that petitioner was ever diagnosed with attachment disorder before trial. To the contrary, the evidence presented by petitioner suggests that he was cared for by an attentive mother. (*See* Flores Aff. at 4-6 (mother ran petitioner's Boy Scout troop, enrolled petitioner in counseling, and "went crazy" buying presents for both children at Christmastime); St. Hab. Tr. at 272 (counseling records describing petitioner's view of his mother as "warm and accepting")). This is not a situation like that of *Wiggins* in which obvious leads were available to counsel, but they failed to pursue those leads. The Court cannot conclude counsel was ineffective for failing to introduce an expert's opinion that petitioner suffered from an attachment disorder.

Similarly, Maxwell bases her diagnosis of petitioner's sensory integration disorder on two fragments of evidence: Flores's affidavit testimony of petitioner's sensitivity to touch as an infant and the note from Dr. Legg in petitioner's school records indicating his sensitivity to weather conditions. (Findings at 2-3). As discussed above, nothing in

the record indicates that Flores discussed petitioner's sensitivity to touch as an infant with counsel during pretrial interviews or that counsel was to blame for her failure to do so. Even if counsel was aware of petitioner's sensitivity as an infant, Flores explains in her affidavit that petitioner started aging out of his sensitivity when he was two-and-a-half years old. (Flores Aff. at 3). The connection drawn by Maxwell between petitioner's sensitivity to touch in infancy and his later sensitivity to weather conditions at the age of six seems tenuous at best, and a reasonable attorney might have concluded that a jury would not be persuaded by a *post hoc* diagnosis premised on these seemingly unrelated bits of data. Nothing in the record, including the 1974 family therapy records, indicates that petitioner was diagnosed with sensory integration disorder at any point in his life before Maxwell made her assessment. Again, this is not a situation where counsel failed to pursue leads that would have yielded persuasive mitigation evidence. The Court cannot conclude that counsel was constitutionally defective for failing to introduce expert evidence of a sensory integration disorder.

Petitioner also criticizes counsel for failing to present expert testimony that he had depressive neurosis, also known as "dysthymic disorder." Maxwell's assessment of petitioner is based on therapy records from 1974, when petitioner was eleven years old, and on incidents that occurred before that time. (Findings at 7). As noted in the discussion of the counseling records above, petitioner's depressive neurosis was not found to be severe. (St. Hab. Tr. at 278). The records reflect that the condition did not impair petitioner's judgment, and his depressed mood was only "moderate." (*See id.*). Petitioner's sister agreed

that petitioner was a "pretty normal, active child." (R. 56:11). Plus, there is absolutely

no evidence that petitioner suffered from depressive neurosis after age 11. (Findings at

7). In fact, petitioner's wife, who married petitioner in 1994 and lived with him for three

years until his 1997 arrest, testified that she had never observed petitioner to have any

"mental problems." (R. 56:79-80). For these reasons, the Court cannot conclude that

counsel was ineffective for failing to introduce expert testimony that petitioner suffered

from depressive neurosis.

Finally, petitioner argues that counsel should have had an expert discuss the fact

that his criminal behavior was modeled and reinforced by his parents. (Findings at 8).

The only evidence that petitioner's behavior was modeled and reinforced by his parents

comes from petitioner himself in his new affidavit. Petitioner claims that he began helping

his father steal equipment when he was eight years old, that his mother rewarded him

for stealing from his grandmother before age 10, and then began robbing local businesses

and turning the money over to his mother, who rewarded him with "robbery celebrations,"

at age 12. (Pet. Aff. at 1, 5-7, 9). Petitioner apparently believes that a jury would have

absolved him of some responsibility for his crimes because he was just following the example

set by his parents. However, this excuse would likely have rung hollow given that petitioner

was 37 years old at the time of Hawkins' murder and by that point had been sent clear

messages by society in the form of three felony convictions that armed robbery was wrong.

The evidence supporting the "parental modeling" theory is also double-edged: the jury

would have learned that petitioner was trained to be a criminal starting at a very young

age and committed robberies on a regular basis as a juvenile before progressing to armed robberies, a violent prison escape, and murder as an adult. This information would have cast petitioner as an irremediable felon and would have enhanced the state's case that petitioner presented a future danger to society. Given these obvious strategic reasons for not presenting the jury with testimony regarding petitioner's negative role models, the Court cannot fault counsel for failing to enlist an expert to present this theory.

d.    Additional Documentary Evidence

To the extent that counsel is asserting that counsel should have investigated and presented evidence from various documents Maxwell claims she researched while developing her report, including prison records and unspecified court records, this argument fails. (*See* Fed. Pet. at App. C, Exh. 5 ("Appendix")). As with the records identified in petitioner's state writ, petitioner has not presented any evidence related to counsel's decision-making with regard to either the investigation or presentation of these records. This failure alone is fatal to his claim with regard to this additional evidence. *See Moore*, 534 F.3d at 468; *see also Bartee*, 574 F.Supp.2d at 649. Furthermore, these additional records do not contain any substantial new mitigation evidence. (*See* Fed. Pet. at App. C, Exh. 4, hereinafter referred to as "Life Timeline"). The most significant evidence found in any of these records is the fact that a sergeant at the Travis County Jail, from which petitioner attempted his first escape, believed that petitioner was not a leader in that attempt. (Life Timeline at 7; Fed. Pet. at App. C, Exh. 10 at p. 87 (prison letter)). But counsel presented this fact to the jury through live testimony. (R. 55:29). Accordingly, counsel's failure to present

evidence from the additional records cited in Maxwell's report did not constitute deficient performance.

## 5.     Review of Entire Claim on the Merits: *Strickland* Prejudice Prong

Even if petitioner could somehow show that counsel's performance was deficient, petitioner cannot satisfy the *Strickland* prejudice prong because all of petitioner's mitigating evidence, including that presented at trial and in these habeas proceedings, could not overcome the powerful evidence presented by the state.  The state habeas court described the state's "overwhelming" future dangerousness evidence as follows:

> Applicant has three aggravated robbery convictions, the last of which resulted in the 99-year sentence he was serving when he escaped from prison.  (RR53: 5-7).  As a fugitive, applicant played primary roles in the aggravated robberies of a Radio Shack, an Auto Zone, and the Oshman's sporting goods store where officer Hawkins was murdered.  (RR47: 57, 76, 103; RR54: 87, 133-34).  When he was captured in Colorado, applicant blamed Hawkins' death on poor police training and bragged about being on America's Most Wanted television show for four weeks.  (RR51: 91-92, 100).  Later, while being transported to the Dallas County Jail, applicant was heard to say, "Ladies and Gentlemen of the press, to the right is the world famous Oshman's." (RR55:128-29).  Further, applicant made a previous unsuccessful attempt to escape from prison in 1981 by accosting a guard with a broken light bulb.  (RR 55:24-25).  And during his prior periods of incarceration, applicant accrued a total of fifteen disciplinary reports, most of which were for fighting.  (RR55: 36-63).

(St. Hab. Tr. at 396, ¶ 104).  In addition, twelve loaded firearms were found in petitioner's hotel room at the time of his capture.  (R. 51:108-119).  The state also presented persuasive evidence of petitioner's moral culpability through petitioner's police statement: petitioner admitted that the Oshman's robbery was a premeditated event that required considerable calculation and planning, petitioner blamed Hawkins's death on poor police training,

evincing a lack of remorse for his actions, and petitioner led authorities on a cross-country manhunt for nearly a month before his capture. (R. 51:37-51, 140-44; *see also* St. Exh. 750).

As the state habeas court correctly observed, through testimony from every living adult member of petitioner's immediate family, "defense counsel thoroughly explored applicant's struggles growing up with an absent father, a broken home, an abusive grandmother, and a medical condition of hyperactivity that caused him to have problems in school and at home." (St. Hab. Tr. at 386, ¶¶ 63 & 65). Unlike the situations in *Williams*, *Wiggins*, and *Rompilla*, the omitted evidence does not indicate that petitioner endured severe abuse or neglect substantially different from the treatment described at trial. The jury was presented with substantial testimony of petitioner's grandmother's physical and emotional abuse towards him, including the graphic description of her breaking his toes and hitting him with various objects, and was also aware that petitioner's father neglected his family emotionally, drank too much, physically abused his wife in front of his children, and struck his children with a "thick leather belt." (R. 55:136-40; R. 56:7, 9, 17-20, 33-34). None of the documentary evidence counsel could have presented, such as the school or counseling records, contains any evidence of physical abuse or extreme neglect. While Flores now sets forth additional instances of abusive behavior by petitioner's father and grandmother in her affidavit, such as the aforementioned episodes when petitioner's father pushed his hand into dog excrement and kicked him in the groin and a time when petitioner's grandmother told him he would die from the mumps, (Flores

Aff. at 3), these additional details do not significantly alter the landscape of petitioner's family background presented at trial. Petitioner also describes his father's physical abuse in more detail in his affidavit, claiming that his father would hit or beat him with "whatever was closest to him" and that he once shot him in the arm with birdshot while disciplining him. (Pet. Aff. at 2). These allegations are not so shockingly different from the facts presented at trial that they would have altered the jury's view of petitioner's troubled relationship with his father in a dramatic way.

Petitioner also now alleges that his mother was physically abusive towards him, claiming that she beat him with her fists and a glass Coke bottle. (Pet. Aff. at 3). It is unclear how frequently this abuse allegedly occurred, but petitioner states that he was able to keep her from harming him by the time he was 13. (Pet. Aff. at 3). Given the fact that the jury was aware of more severe and frequent abuse at the hands of petitioner's live-in grandmother, this evidence would not have significantly altered the jury's view of his childhood. Additionally, the available evidence casts doubt on this claim. Petitioner's sister does not corroborate this story and testified at trial that her mother disciplined the children by sending them to their room and spanking them by hand. (Flores Aff. at 5; R. 56:17). The 1974 counseling records also contradict petitioner's new allegation, reflecting that petitioner, at the age of 12, viewed his mother as "warm and accepting." (St. Hab. Tr. at 272).

This case is further distinguishable from those in which the Supreme Court has granted habeas relief in that there is absolutely no evidence that petitioner is "borderline

mentally retarded" or ever suffered from a serious mental illness or brain injury. In fact, the school records counsel successfully kept out of evidence would have shown that petitioner's I.Q. was within the normal range. (St. Hab. Tr. at 266). Petitioner's learning difficulties and hyperactivity are not tantamount to a mental illness or brain injury, and, in any event, the jury was made aware of these issues. (R. 56:10-11, 13-14, 30-31). Although counsel did not inform the jury of petitioner's single diagnosis of depressive neurosis in 1974, this diagnosis comes nowhere close to describing the type of severe and chronic psychiatric condition counsel failed to introduce in *Rompilla*.

Petitioner's new allegations of poverty also do not come close to describing the "deplorable living conditions" faced by the defendants in *Williams*, *Wiggins* and *Rompilla*. After his parents separated, petitioner lived in a one-bedroom "shack" with his mother, grandmother and Flores for less than a year. (Flores Aff. at 6). The family heated the house with two propane heaters that winter, and there is no evidence that the housing situation, though perhaps cramped, was inadequate or that the family lacked basic necessities. (*Id.*). Within one year, the family had moved in to the home of a family member in Texas. (*Id.*). Soon after, petitioner's mother found a job as a housekeeper and moved the family into a small duplex. (*Id.* at 7). Flores and petitioner, teenagers by this point, lived off popcorn and Pepsi and grazed for food and shoplifted at the grocery store. (*Id.*). Also, although petitioner was "homeless" after he moved out of his mother's house at age 16, this period of homelessness was short-lived, as petitioner moved in with his father before returning to live with his mother. (*Id.* at 8). While not optimal, these

living situations are a far cry from the nightmarish conditions described in *Williams* and *Wiggins* or the "slum environment" described in *Rompilla*.

Moreover, much of the omitted evidence would have been detrimental to petitioner's case. The Court has already addressed the prejudicial impact of various information in the school and counseling records. The affidavits attached to Maxwell's report contain additional harmful evidence. Flores describes petitioner as having "rage," (Flores Aff. at 9), and recalls that petitioner began fighting back against his father at the age of five, climbing his father's back and beating his father's head with his fists. (*Id.* at 3). As a very young child, petitioner would "just stand and hit [Flores]" while she "just [stood] there and [took] it." (*Id.*). Petitioner also had a history of fighting with his peers, (*id.* at 4), a female cousin, (*id.* at 7), his mother's boyfriends, (*id.* at 8), and his wife, (*id.* at 2). On one occasion, petitioner even provoked the family's old dog into biting him. (*Id.* at 8 ). Flores also recalls that she and petitioner began shoplifting as teenagers and that petitioner began robbing taxi drivers at gunpoint at age 17 to help pay his mother's bills. (Flores Aff. at 7, 8-9). All of this testimony would only have reinforced the jury's belief that petitioner was a dangerous individual with violent tendencies.

In his new affidavit, petitioner admits that he was a reckless child who engaged in wild pranks and stunts like leading the police on motorcycle chases and lighting a friend on fire, stole money from his grandmother, regularly committed robberies beginning at age 11 or 12, and had a history of violent fighting even as a child. (Pet. Aff. at 1, 4, 6-8). Petitioner's continued unwillingness to accept responsibility for his crimes is the overarching

74

theme of much his affidavit, and this attitude would very likely have inflamed the jury.

He claims that he committed one of the robberies of which he was convicted for his mother

and another one for his wife. (*Id.* at 9, 11). Although he admits to robbing the La Quinta

Inn, he complains that he was convicted based on bogus evidence. (*Id.* at 11). He also

attempts to justify and minimize both his criminal history and actions he took on the

night of Hawkins' murder:

> I realize now that I put myself at risk trying to help other people. I admit
> to being a robber. It was the only way I could see to supplement my income.
> I was a workaholic. I worked all the time. Because I didn't have any
> education there were only so many jobs I could get. Being a felon didn't
> help either in the job department. I tried to stay straight every time I came
> out of prison.
>
> I never hurt anyone in all the robberies I ever did. I am not a murderer.
> Even though I said that I shot in the direction of what I believed to be an
> officer in the Oshman's robbery, I didn't shoot to kill. I shot to run him off.
> I shot way above his head.
>
> I never stole from any one individual. I wouldn't steal from a person. I only
> stole from businesses or companies. I never hurt anyone and a lot of the
> time the guns I used didn't even work. I knew they had insurance to cover
> those kinds of things. I also knew that they would report a lot more money
> being stolen than actually was. That is just the way those things work.

(11-12). Petitioner's lack of remorse for the danger and loss he repeatedly caused society

is evident in these statements, which would only have angered a jury that had heard

testimony from petitioner's terror-stricken victims and was privy to petitioner's confession

in which he blamed Hawkins' death on inadequate training. It is a credit to counsel that

he did not attempt to introduce this additional testimony and protected petitioner from

what surely would have been an excoriating cross-examination.

In sum, the mitigating evidence counsel allegedly failed to present in this case is not tantamount to the evidence of torturous life histories omitted in *Wiggins*, *Williams*, or *Rompilla*. Counsel presented a thorough case for mitigation, focusing on traumatic events in petitioner's childhood, emphasizing the positive influence petitioner had on his stepchildren and wife, and pointing out the heightened security petitioner would be under if given a life sentence. The omitted evidence would not have fundamentally altered the portrait of petitioner's life presented to the jury and very well might have undermined the defense's attempts to cast petitioner in a positive light. Weighing the state's powerful evidence of future dangerousness and moral culpability against petitioner's far weaker mitigation evidence, the Court cannot conclude that any member of the jury would have been persuaded to grant a lesser sentence had it been exposed to the omitted evidence. *See Blanton v. Quarterman*, 543 F.3d 230, 239 & n.1 (5th Cir. 2008) (finding petitioner not prejudiced where mitigating evidence counsel failed to present "not nearly as strong" as that submitted in cases in *Rompilla*, *Wiggins*, and *Williams*, in which "mitigation evidence attorneys failed to uncover was shocking and starkly different than that presented at trial"); *see also Alexander v. Quarterman*, 198 Fed.Appx. 354, 362 (5th Cir. 2006). Accordingly, petitioner's ineffective-assistance-of-counsel claim is denied.

IT IS THEREFORE ORDERED that Petitioner's Petition for Writ of Habeas Corpus be, and is hereby, DENIED.

The Clerk of Court shall transmit a true copy of this Order to Petitioner and to Counsel for Respondent.

SO ORDERED.

Signed this 21st day of September, 2010.

_Ed Kinkeade_

ED KINKEADE
UNITED STATES DISTRICT JUDGE